McFaRLAND, J.,
delivered the opinion of the Court.
This is a bill filed in the Chancery Court at Gal-latin hy Eliza Morris and her children against the heirs at law of James L. Swaney, deceased, to have set up a will, which they allege was made and published by said Swaney, but was lost or suppressed by fraud or accident. Said Swaney was murdered by some unknown parties about the month of November, 1865. He had never been married, but left his father, and brothers, and sisters, and their issue, surviving him as his heirs and distributees.
The -complainant Elizabeth Morris was never married, but she is the mother of a number of illegitimate children, her co-complainants in this case, and she alleges that Swaney was the father of all her children; that he and herself had been co-habiting together for many years previous to his death, and that many years previous to his death he made and published his will, leaving his entire property to her during her life, with remainder to her children by him.
The bill was answered, and its material allegations denied. When the cause came on for hearing, the complainants demanded a jury, and thereupon an issue of fact was made as follows:
“The complainants come and aver that James M. Swaney left at the time of his death a will, in which he gave, after the payment of his debts, all of his estate, both real and personal, of which he might be possessed, to Eliza Morris for and during her natural *593 life, and at her death to her children by the said J. M. Swaney, to be equally divided between them, and that said will has been lost or destroyed or suppressed, either by accident or fraud, ‘and they ask that the same be inquired of by a jury of the country.”
To this there were replication and issue.
A jury were empaneled and failed to agree. At a subsequent term another jury were empaneled, who returned a verdict, finding the issue in favor of the complainants, and that the paper exhibited with the bill is a substantial copy of said will. A new trial was refused the defendants, and decree pronounced setting up the will, and from this the defendants have appealed.
The jurisdiction of courts of chancery in this State to set up lost wills when the facts clearly appear, has been considered as well settled since the cases of Brown v. Brown, 10 Yerg., 84; Buchanan v. Matlock, 8 Hum., 390.
The first question that presents itself is, what effect shall be given to the verdict of the jury? The practice originally was to treat the verdict of juries upon issues submitted in chancery as only advisory, and the Chancellor had the power to set the verdict aside, and either award a new trial or ascertain the facts for himself, and decree accordingly.
This question has very recently been before this Court, at the last term at Knoxville, in the case of James v. Brooks, in which it was held that the English practice which had previously prevailed in this country was changed by the act of 1846, and upon *594 a construction of ss. 3155, 3156, 4465, 4469, and others of the Code, that the verdict of. a jury in a case like this, when either party, under the right given, has demanded a jury, shall have the same force and effect as the verdict of a jury at law; and as a consequence, the Chancellor can not disregard this verdict, and decree upon a state of facts which he may decide for himself to be different from the facts found by the jury.
The Chancellor has the power to grant a new trial of the issue, upon the same grounds, and for the sam'e reasons, that a Circuit Judge may grant a new trial at law; but unless a new trial is thus granted, the verdict of the jury is conclusive upon the Chancellor as to the facts found, and he can not disregard them. This we think is the obvious effect of the positive language of ss. 3156 and 4469 of the Code.
In the case of Lowe v. Traynor, 6 Col., 633, there was an issue submitted by the Chancellor' upon his own motion, and this Court held that a verdict found in response to this issue was only advisory, and might be disregarded. In that case however, the Court expressly say that they express no opinion as to the effect of a verdict made up and submitted to a jury upon the application of either party as provided for by the Code.
This therefore is not in conflict with the case first referred to, of James v. Brooks, which we are content to follow as the settled law. It results therefore that we are not required to determine whether from the facts and proof appearing in this record the com *595 plainants bave made out their case with the degree of certainty and clearness to entitle them to a decree; or, in other words, it is not our province now to determine the facts, except so far as it may be necessary to do so in determining whether or not the defendants are entitled to a new trial.
In' the numerous depositions read to the jury a great number of exceptions appear to have been taken to the evidence, but the bill of exceptions shows that these exceptions were all waived upon the trial, except so far as the same are set forth and acted upon in the bill of exceptions. And in this bill of exceptions only two questions of evidence are made.
1. The complainants were allowed to read the deposition of Mrs. Bird after the close of the defendants’ testimony, and against their objection. Part of this deposition seems to be rebutting testimony, and part evidence in chief. The plaintiff’s attorney made affidavit that the failure to read the deposition in chief was a mere inadvertence, for the reason that he had overlooked the fact that it contained any evidence in chief. There was no error in this. It was a matter within the discretion of the Chancellor, and the discretion was properly exercised.
The bill of exceptions further shows that the defendants proposed to prove that, from reputation, Eliza Morris was a woman devoid of virtue, and the Chancellor held that this was not admissible except as to the time previous to the commencement of the intercourse between her and James M. Swaney; but held that the parentage of her children might be proven by *596 reputation. There was no error in this, especially in view of the fact that there is an abundance of evidence in the record to the same effect to which there was no exception. There was no other question of evidence in the case.
The charge of the Chancellor to the jury was clear and direct. The requirements of the law as to the manner of executing a will sufficient to convey lands were correctly given. The jury were repeatedly told that the complainants must introduce evidence, clear, full, and satisfactory, to establish the facts in their favor. The jury were further told that two witnesses were required to the factum of the will, but that two witnesses were not required to each particular fact. That one fact may be proven by one witness, and other facts and corroborating circumstances may be proven by other witnesses. This is in accordance with the case of Johnston v. Fry, 1 Col., 100.
The question mainly pressed in argument is this: The will is alleged to have been written in 1845. Both the alleged subscribing witnesses are dead. No copy of the will is produced, nor is it insisted that there is a. copy. No witness is introduced who proves that he ever read the will. The proof of the contents of the will rests alone upon the testimony of witnesses who repeat its contents from having heard it read by others, the witnesses themselves being illiterate. This proof is corroborated by the declaration of testator, and other circumstances. . The question is, can the contents of the will be proven by this character of evidence? For the defendants it is ar *597 gued that they can not. No special instruction was asked upon this subject, but the Chancellor in substance charged the jury that the complainants were required to establish their case by the best evidence in existence; that, however, the law did not require an impossibility, and that if the will was lost, and the subscribing witnesses dead, the will might be proven by such evidence as would clearly and fully satisfy their minds of its execution and of its contents.
This as applied to the evidence introduced, was equivalent to saying that the contents of the will might be proven by the character of evidence that was introduced; that is, by the evidence of witnesses who heard it read, and such facts as were proven in corroboration, provided such evidence were sufficient to satisfy their minds.
The question is, was this erroneous? In the case of Chisholm’s Heirs v. Rue et als., 7 B. Monroe (Ky. Reports), 408, it is strongly intimated that, the contents of the will could not be established except upon the evidence of those who had seen and read it, and that the declarations of the decedent, or the professed reading of the _ decedent, are not sufficient for that purpose, and not even admissible, except as corroborative of more direct evidence. But the authorities referred to by the learned Judge do not very strongly sustain his position.
In the case of Everett v. Everett, 41 Barbour’s N. Y. Rep., it was held that the evidence of witnesses who had heard the will read was admissible as to its contents. In that case , there was other and bettér *598 evidence, and no special objection to tliis evidence; but the evidence of the witness who heard the will read was considered admissible and important.
In Redfield on Wills, vol. 1, pt. 2, p. 8, note, - it is said that the result of all the American authorities seems to be that lost wills may be established "by the same kind of evidence as other lost instruments: 1st, by a copy; 2d, by proof of its contents from memory and recollection. It is said, however, that in practice few lost wills are established, unless there' is reason to believe that they were purposely suppressed. There is no doubt that the knowledge of a witness who only hears a paper read is not of as high a character as that of a witness who reads himself, for the witness who hears it read can not know that it is correctly read to him. Still his evidence must be admissible. How satisfactory it will be, depends upon other circumstances.
It can not be upon principle that the evidence of the contents of a paper must necessarily be derived from a reading by the witness. Records may be proved by an examined copy; that is, by producing a witness who has compared the copy with the original, or with what the officers of the court, or any other person, reads as the contents of the record. It is not necessary for the persons examining to exchange papers, and read them alternately both ways. 1 Greenl. Ev., sec. 508. This shows that the reading by another party may be the means by which the witness obtains a knowledge of the contents of the paper.
*599 In this case, the jury were properly told that it must appear that the will was lost or destroyed, and upon this we think that the evidence of witnesses who heard it was competent as to its contents, unless it were made to appear that there was in existence better evidence of them; that is, a copy. 2 Greenl., sec. 84.
The important question remaining is, whether this verdict is sustained by the evidence; and here again we repeat that we express no opinion as to what would be our conclusion were it our duty to' determine from this evidence whether the complainants have fully and clearly made out their case. But the question is whether this verdict is sustained by the evidence in accordance with the well-understood rulings of this Court upon the subject. It was necessary for the complainants to establish to the satisfaction of the jury: 1st, the fact that Swaney made and executed a valid will in accordance with the forms of the law; 2d, the substance or contents of said will; 3d, that the will had not been revoked, and that it is lost, or destroyed, or can not be found after due and proper search.
The record presents an immense amount of testimony, much of which is wholly irrelevant. Witnesses have been impeached and sustained, both by evidence of their general character, and by proving contradictory statements. Is there a sufficiency of evidence, if true, to sustain the above propositions?
Bodenie Morris, a sister of the complainant Eliza, proves that, in 1844 or 1845, she was at the house *600 of her sister Eliza when Swaney, E. Grundy Haynes, and J. E. Gilmore came; and that while there, Haynes wrote the will of Swaney, and read it in her hearing. That it was signed by Swaney, and witnessed by Gilmore and Haynes. That she saw them sign it. The will left the property to Eliza during her life, and at her death to her children by Swaney., After the will was signed and witnessed, Swaney handed it to Gilmore, who took it away with him, Swaney telling him to take good care of it.
Jesse Holt proves that in 1844 or 1845, he was at the house of Eliza Morris when Swaney, Haynes, and Gilmore, were there. They were doing some writing.- After the writing was done, .witness saw a paper in the hands of Haynes, and asked him what he had been writing. He replied, Swaney’s will. He said, he held in his hands a copy of Swaney’s will.
In this conversation, Haynes said that Eliza Morris was to have the property at Swaney’s death, and that at her death it was to go to her children, — this in Swaney’s presence. Rachel Ann Morris, one of the complainants — the bill having been dismissed as to her, and she having executed a release — proves that Swaney, Gilmore, and Haynes, showed her a paper, and read it to her, purporting to be Swaney’s will, leaving all the property he was possessed of to Eliza Morris during life, and at her death to her children. That Swaney often talked to her about the will, and told her he had left her something. That she saw him with a paper which he said was his will, about a week before his death.
*601 Mrs. Mildred Bird proves that shortly before his death, she heard Swaney say, in conversation, that he had a will, and that he spoke of doing something for Eliza.
One Martin proves that he had a conversation with Swaney shortly before his death, in which he said he had a will, and he thinks he had a paper in his hand. There is proof going to show that he spoke ' of having the will re-witnessed. The proof fully shows that, many years before his death, Swaney placed the complainant Eliza and her children in possession of a tract of land belonging to him, and that she remained upon it until his death. That some time before his death he placed two of the older children in possession of another piece of land which they still retained at his death.
The proof further fully shows, and it is not controverted, that Swaney recognized all" of Eliza Morris’s children as his, except the two youngest. As to these two, there is some conflict in the proof, but the weight of the proof probably is that he recognized these also.
It is proven by J. B. Parsons, that shortly before Swaney’s death, he applied to him to buy the land on which Eliza Morris lived. Swaney replied that rumor said Eliza Morris’s children were his; and that if so, they had as much right to live on the land as any one else.
There are many other declarations, acts, and statements of said Swaney, more or less bearing upon the question, and tending to corroborate the testimony of the principal witnesses.
*602 There is testimony showing that diligent search was made among the papers of Swaney shortly after his death, but no will was found. It appears that this search was made for the express purpose of finding a will. The proof shows that his house and papers were in possession of his heirs after his burial, and before this search among his papers was made; and statements of the father and brother of the deceased are proven, strongly indicating that they believed a will had been made-.
On the other hand, the general character of many of these witnesses is impeached, and again sustained. They are contradicted and corroborated. There are many facts and circumstances in proof upon the part of the defendants tending to throw doubt and uncertainty upon the testimony of the complainants, but we can not review these facts. We can not undertake to analyze in this opinion the entire hody of the proof.
The question as to the credibility of witnesses is peculiarly one for a jury. The question is, whether this verdict is sufficiently sustained by evidence. In many of the cases in our Court upon this subject it has been said that this Court will not reverse upon the facts, if there is evidence. In some it is said if there is any evidence to support the verdict. In a more recent case the rule is said to be, that this Court will only reverse upon the facts of the case when there is a great preponderance of evidence against the verdict found by the jury, so that we can see clearly that the judgment of the law upon *603 all tbe facts shown in the evidence is' not that which the jury have found. Nance v. Hanly, 1 Heis., 177.
Do the facts in this record greatly preponderate against the verdict?
If the jury were authorized to take the testimony of complainants’ witnesses as true, with the corroborating circumstances, all of which we have not enumerated, then they might well have found the verdict they did. Without examining in detail the testimony of the defendants, it will be sufficient to say, that it does not greatly preponderate against the verdict.
We can not say that the jury were wrong in giving credence to the testimony upon which their verdict is founded. The jury were told that if the will was proven to have been in the possession of Swaney the testator, the law presumes, as it was not found after his death, that it was revoked; but that if the facts and circumstances satisfied them that it was not revoked, they would so find. Without reviewing the evidence upon the subject, it will be sufficient to say, that there are circumstances sufficient to sustain the finding of the jury in this respect.
We find no material errors of law in the record. As to the facts, the parties have, under the right given by the law, appealed to a jury of the country; and, under the rules applicable in such cases, we do not feel authorized to set their verdict aside.
Affirm the decree with. costs.