# HAVEN v. WRINKLE et al.—195 S. W. (2d.) 787.

Eastern Section. September 6, 1945.

Petition for Certiorari denied by Supreme Court, January 19, 1946.

Rehearing denied by Supreme Court, May 4, 1946.

196

Chas. S. Mayfield and Geo. E. Westerberg, both of Cleveland, for appellant.

John S. Wrinkle and F. Todd Meacham, both of Chattanooga, for appellees.

HALE, J. The bill in this cause was filed to set up a will executed by Mrs. Margaret W. Taylor, in October, 1938, witnessed by Mr. and Mrs. Chas. S. Mayfield, and to enjoin the probate of her will dated Aug. 30, 1938,

known as the Wrinkle will. The Chancellor found and decreed that the will had been so executed but had been destroyed and revoked by the testatrix with the intent of reviving the Wrinkle will. Complainant appeals and assigns errors which will hereinafter be set forth with particularity.

Mrs. Taylor was a widow without issue. She died February 12, 1941, the owner of a valuable estate consisting of real and personal property.

Her heirs at law, had she died intestate, would have been her brothers and sisters or their issue. The complainant, Mrs. Haven, was her sister and there seemed to have existed between them an attachment strong enough to survive several spats between them and displays of temper especially on the part of Mrs. Haven. The defendants Wrinkle are the children of a deceased sister of Mrs. Taylor. One of them, John S. Wrinkle, is a member of the Chattanooga bar but occasionally practicing in Cleveland where Mrs. Taylor, Mrs. Haven, and his sisters, Misses Emma Wrinkle and Verna Wrinkle, resided. There was a sister, Mrs. Hugger, a brother, John Williams and various nephews and nieces, the children of other brothers and sisters.

We think the record shows Mrs. Taylor to have been somewhat wishy-washy and apt to reflect the views of the person she was with at that particular moment. This irresolute and vacillating character and conduct has led to one of the most perplexing cases we have ever had before us.

In 1935 she executed the following will:

"I, Margaret Williams Taylor, of Cleveland, Bradley County, Tennessee, being of sound mind and disposing memory, aware of the uncertainty of life and of the certainty of death, do, make, publish and declare this to

be my last will and testament, hereby revoking and making null and void all wills made by me at any time.

1. I direct that all my just debts, including funeral expenses and expenses of administration, be paid by my Executrix, hereinafter named.

2. I give, devise and bequeath unto my sister, Gertrude Williams Haven, all of my real estate, of every kind and wherever located and all household goods and kitchen furniture and the contents of every kind, which are located in my home at 2719 Ocoee Street, Cleveland, Bradley County, Tennessee, and also all of my Tennessee Electric Power Company stock, and three shares of stock in the Merchants Bank of Cleveland, Tennessee, of which I may die seized and possessed.

3. I will and direct that my Executrix hereinafter named, shall divide the remaining portion of my estate as nearly as possible into three equal parts. One of said parts shall be paid over or transferred to my nephew, Fredrick J. Goodner, of Reedley, California, or his heirs; another part shall be paid over or transferred to my nephew, Leland L. Goodner, of Fresno, California, or his heirs; and the remaining portion shall be held in trust and managed by my said nephew, Fredrick J. Goodner, and his mother, Dora Williams Gallaher, or the survivor of them, for the use and benefit of my nephew, William J. Goodner, of Reedley, California, he to receive the net income therefrom and they, or the survivior of them, to pay over to him from time to time any portion or portions of the corpus of the fund that they, or the survivor of them may believe it will be to his best interest and welfare to receive. If any of said fund shall remain at the end of ten years from the date of its establishment, said Trustees, or the survivor of them, shall pay over or transfer it to said William J. Goodner. If said

William J. Goodner shall die before the expiration of said trust, the portion of the fund set aside for his beneficial interest shall pass to his heirs.

4. I nominate and appoint my sister, Ada Williams Hugger, of Chattanooga, Tennessee, as the sole Executrix of this my last will and testament, and reposing implicit confidence in her integrity, I excuse her from the execution of bond for the performance of this trust and the carrying out of the terms of this my last will and testament.

In Witness Whereof, I have hereunto set my hand and subscribed my name on the 5th day of March, 1935.''

Margaret Williams Taylor''

This is material to show her feeling for Mrs. Haven, who, it is stated, would have received the bulk of the estate thereunder.

One of the Goodners borrowed some money from Mrs. Taylor and did not repay her. She was dissatisfied with their conduct so she revoked this will by the Wrinkle will of Aug. 30, 1938, which is as follows:

''I, Margaret Elizabeth Taylor, of Bradley County, Tennessee, and widow of Dr. R. L. Taylor, being of sound mind and disposing memory, do make, declare and publish this my last Will and Testament, hereby revoking all other Wills heretofore made by me.

### Item I.

I hereby direct my Executrix to pay, as soon as possible, after my death, all my just debts, and funeral expenses, and to suitably mark my grave.

### Item II.

I will, devise, and bequeath all my other property, including all money, stocks, notes, real estate, and other property to Ada W. Hugger, Trustee, for the life of my

sister, Gertrude W. Haven, and then to my nieces, Emma Wrinkle and Verna Wrinkle, absolutely, and share and share alike.

. The purpose of the trust created by this Item of my Will is for the Trustee to possess, use and rent my real estate and to loan or invest my personal property so as to produce income, and after the payment of taxes, upkeep, and repairs, to use such portion of the income as said Trustee, in her sound discretion, may deem wise and proper for the support of my said sister, Gertrude W. Haven, during her natural life, and no part of the same is to be subject to execution or other legal process for any debt or liability my said sister may have contracted, or may hereafter contract; and my said sister shall not have the right to anticipate or assign any income that she might receive from this trust. Any amount of income money in the hands of the Trustee not used for the support of my said sister, Gertrude W. Haven, shall go to my said two nieces, Emma Wrinkle and Verna Wrinkle.

In the event either of my said nieces, Emma Wrinkle or Verna Wrinkle, should die before the date of my death then the survivor of said two nieces shall take all the property devised and bequeathed to both of them under this Item of my Will.

I suggest to my said nieces that when they no longer need my furniture and jewelry that they pass it on to members of the family who now know me and will appreciate it.

### Item III.

· . I have absolute confidence in both the ability and integrity of my sister, Ada W. Hugger, as Trustee, and she shall not be required to take any oath or to give any bond as such Trustee; and she shall not be liable for mistakes of judgment. In the event that my said sister, Ada W.

Hugger, should be unable to act as Trustee or to continue as Trustee then I will, direct and appoint my nephew, John S. Wrinkle, Trustee, and I have confidence in both his ability and integrity and no oath or bond, as such Trustee, is required of him; but should my sister, Ada W. Hugger, Trustee, or either of my nieces, Emma Wrinkle of Verna Wrinkle, desire that he give bond for the faithful performance of his duties as such Trustee, then he shall be required to give such bond as shall be fixed by the Court having jurisdiction thereof.

### Item IV.

I hereby nominate and appoint my niece, Verna Wrinkle sole Executrix of this my last will and Testament, and I expressly excuse her from giving any bond for the faithful performance of her duties as such Executrix; but should my sister, Ada W. Hugger, Trustee, desire Verna Wrinkle, as such Executrix, to give bond, then she shall give such bond for the faithful performance of her duties as Executrix as may be fixed by the Court having jurisdiction.

In Witness Whereof, I, the said Margaret Elizabeth Taylor, have hereunto set my hand on this the 30th day of August, 1938.

Margaret Elizabeth Taylor.''

One of the reasons for this trusteeship was the fact that Mrs. Haven's husband had died leaving debts upon which the wife was liable, and Mrs. Taylor feared her estate might be used in defraying Mr. Haven's debts. However, Mrs. Haven had from her property and insurance paid all or the greater part of these debts except a mortgage on her home which was taken over by her sister, Mrs. Hugger.

Then in October, 1938, there was executed the Mayfield will expressly revoking ''all wills by me heretofore

made'', and which except for date and signature is as follows:

''I, Mrs. Margaret W. Taylor, a citizen of Cleveland, Bradley County, Tennessee, being of sound mind and disposing memory, but realizing the uncertainty of life and the certainty of death, do hereby make, publish and declare this to be my last will and testament, hereby revoking all wills by me at any time heretofore made.

First:—If I should owe any just debts at the time of my death, including doctor bills and funeral expenses, I direct my Executrix, hereinafter named, to pay them,

Second:—I will, devise and bequeath all property of every kind and character that I may own at the time of my death, real, personal and mixed, and wherever the same may be located, to my beloved sister, Mrs. Gertrude Williams Haven, to be her property absolutely and in fee simple, with no reservations or exceptions whatsoever.

Third:—I nominate and appoint the said Gertrude W. Haven to be Executrix of my estate, and expressly direct that she be excused from entering into bond or rendering reports and inventories or accountings to any Courts or tribunals.

In Witness Whereof, I have hereunto signed my name to this instrument as and for my last will and testament, in the presence of the undersigned subscribing witnesses who sign as witnesses at my request, in my presence, and in the presence of each other, on this, October ——, 1938.''

A carbon copy of the body of this will was retained by Mr. Mayfield and filed as an exhibit to his testimony. The exact date of the execution of this will is shown by the testimony of the defendants Wrinkle to have been Oct. 28, 1938.

The will was dated, then signed by Mrs. Taylor in the presence of Mr. & Mrs. Mayfield who signed as attesting

witnesses thereto. All statutory formalities were observed and the will was left with Mrs. Taylor. Mr. Mayfield was paid for his services and he then took Mrs. Taylor to the Wrinkle home, she having stated she was going over there and Mr. Mayfield volunteered to take her in his car.

She told Mr. Mayfield she was dissatisfied with a former will but did not tell who was the draftsman or the date of its execution. And she said the will he had drawn was exactly what she wanted.

Mrs. Haven testified that Mrs. Taylor repeatedly told her prior to the execution of the Mayfield will that she was going to leave all of her property to her, and on October 15, 1938, told her a will to that effect had been made. She did not state who was the draftsman thereof. Mrs. Taylor and Mrs. Haven were on the most intimate terms from then on until her last sickness and Mrs. Haven testified that her sister never told her she had revoked the will giving her the estate. She also testified to having searched for and failed to find the Mayfield will after her sister's death.

Jennie Jarrett, a domestic servant of Mrs. Taylor's, said her mistress told her of having executed the Mayfield will leaving everything to Mrs. Haven and that several times thereafter and on up until about six months before her last illness she spoke of the Mayfield will being written the way she wanted it. She also said that Mrs. Taylor told her the Wrinkle will was written after the Mayfield will; that when she signed the Wrinkle will she (testatrix) didn't get to read it and that he (Mr. Wrinkle) grabbed it from her and ran away with it. We attach but little credence to this latter statement as it bears on its face inherent weakness. Mrs. Taylor told Tom Brown, a plumber with whom she had considerable dealings, that she was giving all she had to Mrs. Haven. These

declarations were made several times, the last apparently being around Christmas prior to January, 1940, when Mrs. Taylor became sick and disabled.

Mr. John S. Wrinkle and his sisters, the Misses Emma and Verna Wrinkle, testified that Mrs. Taylor was a regular and almost nightly visitor to the old Wrinkle home; that on March 4, 1938, a mortgage on Mrs. Haven's home was being foreclosed; that Mrs. Taylor discussed this with Mr. Wrinkle and wanted him to look into the foreclosure so that she, Mrs. Taylor, might bid in the property for Mrs. Haven; that she told of the 1935 will and asked Mr. Wrinkle to write another, creating a trust for Mrs. Haven; that Mr. Wrinkle suggested she have Mr. Mayfield write it, and, this not being satisfactory, later suggested she have Mr. J. B. Sizer, of the Chattanooga bar, write it. She agreed to this if Mr. Wrinkle would go with her, that when it was found Mr. Sizer was ill she insisted upon his (Mr. Wrinkle) writing the will; that he delayed this somewhat and was upbraided by her and finally drew it as she directed. They say that Mrs. Taylor insisted upon a trust being created for Mrs. Haven. The execution of this will is proven; that it met with the approval of Mrs. Taylor, etc., and was turned over to Mr. Wrinkle to be placed in his safety deposit box. Sometime in September following the execution of the will on August 30th, Mrs. Taylor wanted the word ''liberally'' inserted in the will so as to authorize the Trustee to ''liberally use'' the income for the benefit of Mrs. Haven. Being advised it would be necessary to re-execute her will, she decided against this.

The Misses Wrinkle testify that on October 28, 1938, Mrs. Taylor came to their home, saying she had been brought there by the Mayfields and that Mr. Mayfield had written her will.' She was then reminded that Mr. Wrin-

kle had written a will for her, to which she replied she had lost it. She was then reminded that Mr. Wrinkle had it in his safety box. They say Mrs. Taylor then wanted to go home and burn the Mayfield will but after some talk she decided she would look after it later, saying she would not die that night. The next morning, Verna Wrinkle went to Mrs. Taylor's and was shown and read the Mayfield will. Mrs. Taylor stated she wanted to burn it and keep alive the Wrinkle will. Miss Wrinkle then told her she should consult either Mr. Mayfield or Mr. Wrinkle with reference thereto. On the evening of October 29th, Mrs. Taylor went to the Wrinkle home. While there, Mr. Wrinkle came by on his way to Chattanooga from Knoxville. He took Mrs. Taylor back to her home, and while there she told him she was uneasy about the Mayfield will and wanted him to burn it and keep in effect the one he had written. He testified as follows:

"A.—I had been to Knoxville the day before, I had gone up early on Friday morning, this was on Saturday night, the 29th of October 1938, and on my return from Knoxville I came here to the Wrinkle home and Mrs. Taylor was here, and some other people. I took Mrs. Taylor home, she told me she wanted to talk to me, I went upstairs and when I had a seat she told me that she thought she had lost her will, that she had forgotten she had me take it back and she had been worried, and that she called Mr. Mayfield the day before and had him write her will, that she was afraid she would die before she could see me and have her will re-written, and she was afraid the Goodner boys would get something form her estate and she had Mr. Mayfield write a will that would prevent this, but that it was not like she wanted it, and she wanted to burn the Mayfield will and keep in effect the will I had written for her, and had in my possession.

"Q. 34—Did Mrs. Taylor show you that will, and did you read it? A.—Yes, I did.

"Q. 35—Do you recall what date it was executed? A.—It was dated the day before, the 28th of Oct. and was signed by Mr. and Mrs. Mayfield.

"Q. 36—What were the provisions in that will? A.—It gave her estate absolutely to Mrs. Haven.

"Q. 37—That is the will that is set up in the bill in Chancery Court? A.—Yes sir. I think the copy of the will that Mr. Mayfield has filed as exhibit 1 to his deposition is a correct copy of the will she showed me and told me that Mr. Mayfield had drawn and that he and Mrs. Mayfield had witnessed for her, except the copy does not have Mrs. Taylor's signature and does not have the signatures of Mr. and Mrs. Mayfield and the date is left blank, but that was filled in the 28th of October.

"Q. 38—Now the Mayfield will, what advice did Mrs. Taylor ask you for about the Mayfield will. A.—She said it was not like she wanted her estate to go, that she wanted to keep the will I had and keep it in effect and to know if she burned that will would that make effective the will I had written for her. First I asked her if she was positive that she wanted her estate to go as a trust for the life of Mrs. Haven and then to Emma and Verna Wrinkle, as was provided in the will I had written, if she was positive of that, and positive that she didn't want it to go as Mr. Mayfield's will provided, absolutely to Mrs. Haven, and she said she was positive that she wanted it to go like I had written her will for her. I asked her then why she didn't have Mr. Mayfield write the will with a trust agreement, or arrangement, when she had him do it, like she had me do it, and she said she still didn't want to explain to Mr. Mayfield the situation and she thought this will would do until she could see me

and get her will re-written as I had written it unless it was found. I told her I thought if she burned the will with the intention of revoking it and reviving the will I had written it would be good. I was sitting closer to the fire than she was and she passed the will to me and said "well just burn it John", and I passed it back to her and said "no, I wouldn't burn the will for anything, Gertie (meaning Mrs. Haven) would never forgive me if I did, I don't mind writing your will the way you want it, but I would not burn it, if you want that done you do that". Then she stood up and held up the Mayfield will and said "John I revoke this will by burning it, with the intention of reviving the will you have in your safety deposit box". In the meantime she walked toward the fire. She said, "You keep the will and when I am gone you see that it is carried out." At that time she was within a step or two of the fire and she just laid it on the grate and it burned.

"Q. 39—Now after that occurred, did Mrs. Taylor ever mention her will to you again? A.—She mentioned then that Gertie would be so mad at her for creating a trust for her. At that time I said, "You are not afraid of death, but of Gertie" and laughed, and she said, "I am more afraid of Gertie's temper than I am of death" and then she smiled. She never mentioned her will to me any more after that evening."

On his cross examination he testified:

"Q. 11—Why did you think she could re-execute a will that had been revoked verbally without witnesses, and later on thought she couldn't execute that one without witnesses, A.—I didn't know she revoked one verbally, what do you mean?

"Q. 12—When she executed the will I had written, she revoked all former wills? A.—Yes sir, it had a revoking clause.

"Q. 13—Then why did you think she could re-establish a former will without any witnesses and without resigning it? A.—I think that is the law, if she burned the will you had written, with the intention of reviving the will of August 30th, 1938, it would have that legal effect.

"Q. 14—At the time she did burn the will did you tell her what to say when she did it? A.—No, I did not; I just advised her what I have stated, and she stood up and said that herself.

"Q. 15—When did you first tell anybody she had revoked the will I had written? A.—I told my sister Verna the next week, my sister Verna mentioned to me that Mrs. Taylor had inquired of her down at Mrs. Taylor's home on the morning of the 29th what she thought she ought to do, and the next time I was at home Verna spoke to me about it and asked me what the legal effect would be, and I told her what I thought, and she said that Mrs. Taylor had told her that she did burn it in my presence.

"Q. 16—She didn't claim that I had not written the will the way she told me to? A.—No, not at all.

"Q. 17—But she said that was what she told me to put in it? A.—Yes sir, she didn't say anything critical of your work.

"Q. 19—Why didn't you have her endorse that she had revoked that will instead of burning it up? A.—I don't know why. It did not occur to me. She asked me, and on the spur of the moment I told her what I thought.

"Q. 20—Didn't you think it might cause criticism of you to have her revoke that will and to attempt to verbally re-establish the will making you and your sisters beneficiaries under the will, with no witnesses present? A.—I told her after she had burned the will it probably would be safer to have the will re-written and re-executed, that some of the heirs might contend she had not revived that

will and had died without a will, and she said she didn't want to execute a new will for the reason they all knew she had no intention of dying without a will, that none would contend that, and furthermore, the writing of so many wills that some one might say she was crazy, and she said, you know Ada and Gertie have already been saying I am crazy.''

Mr. Wrinkle did not tell Mrs. Haven of the destruction of the Mayfield will and this has caused certain animadversions to be leveled at his testimony. However, both his sisters, the beneficiaries under the will, testify that Mrs. Taylor gave them substantially the same account of the occurrence.

On the one hand we have the execution of the Mayfield will and the announcement by the testatrix that it was what she wanted. To this is subsequently added the testimony of Jennie Jarrett and Tom Brown as hereinbefore set forth. We may concede this would in and of itself authorize a decree setting up the will. But when we look at the other side of the picture we find that the will had been destroyed by the testatrix with the announced purpose of revoking it. There can be no doubt but that it was destroyed. This, in the absence of proof, would authorize an inference of revocation. But there is direct, uncontradicted proof that it was destroyed by the testatrix for the purpose of revoking it. Mr. Wrinkle took nothing directly under the will, altho it is true that he was a substitute trustee, and further, was one of the next of kin of the ultimate beneficiaries and conceivably might inherit from them. However, they testified without objection, that Mrs. Taylor told them she had destroyed the Mayfield will with the intention of revoking it and reviving the Wrinkle will. There can be no ques-

tion but that they too had been considered by her as being worthy of her bounty.

 Where a will has been lost or destroyed, the person seeking to set it up labors under a severe handicap. Doubtless this is due to the fear that a more elastic rule might bring about more fraud than it would prevent. In ·Sizer's Pritchard on Wills, Second Edition, secs. 49 and 50, at pp. 57-62 inclusive, it is said:

"49. Parties to and Frame of Bill to Set up Lost Will.

"A bill to set up a lost or spoliated will may be brought by the person named executor in it, or by any person who would take an interest under it if established, or several interested persons may join in bringing the bill; but every one who would take an interest under the will, or in the estate in case of intestacy must be made a party, either complainant or defendant; and the alleged spoliator or suppressor, if a different person from any of these, must be made a defendant, if any relief is sought against him. The bill should allege,—(1) the due execution of the will; (2) its contents; and a copy should be exhibited with the bill, if possible; (3) the death of the testator, ·leaving the will unrevoked; (4) the loss, destruction or suppression of the will, as the case may be, and the circumstances attending it, in sufficient detail, but without unnecessary prolixity; (5) the interest of the several parties, complainant and defendant, and their connection, if any, with the disappearance of the will, and, (6) it should pray that the will be set up and established by decree of the court, or that the party suppressing it be compelled to produce it; that it be then certified to the proper county court to be recorded, and for the issuance of letters testamentary, that its provisions be enforced if necessary, and for such other relief as the complainant may be entitled to on the facts of the particular case."

"50. Proof Necessary to Set up Lost Will; Decree.

"For the establishment of the will, it is necessary for the complainant to show to the satisfaction of the court: —1st, that the testator made and executed a valid will in accordance with the forms of law, and the death of the testator; 2nd, that the will had not been revoked, and is lost or destroyed, or can not be found after due and proper search; 3rd, the substance and contents of the will."

In discussing the second essential, this author says:

"2. When a will can not be found after the death of the testator, there is a strong presumption that it was destroyed or revoked by the testator himself, and this presumption stands in the place of positive proof. He who seeks to establish a lost or destroyed will, assumes the burden of overcoming this presumption by adequate proof. It is not sufficient for him to show that persons interested to establish intestacy, had an opportunity to destroy the will. He must go further and show by facts and circumstances that the will was actually fraudulently or accidentally lost or destroyed, against and not in accordance with, the wishes and intention of the testator. But the presumption that the will was destroyed by the testator, animo revocandi, may be rebutted, and its loss or destruction by other means may be shown, by circumstantial as well as positive evidence; as, by showing that the testator did not have the custody and control of the instrument after its execution; that he had lost his testamentary capacity for a period before his death, and that the will was in existence at the time the mental alienation occurred, and the like. The declarations of the testator, before or after making the will, are admissible in evidence to support or destroy the presumption of revocation." Ibid.

██ ██ Our cases support this statement. In Judge Turleys monumental opinion in Buchanan v. Matlock, 27 Tenn. 390, at page 395, 47 Am. Dec. 622, it is said:

"For it is laid down by Swinburne 'that, if a testament be made in writing, and afterwards lost by some casualty, if there be two unexceptionable witnesses who did see and read the testament written, and do remember the contents thereof, these two witnesses so deposing to the tenor of the will are sufficient for the proof in form of law. In which case the court will grant probate of the will as contained in the depositions of the witnesses." Swin. 2 s. pt. 14, pl. 4. And Mr. Williams says, page 209 of his work on Executors, 'that at this day it is quite clear that the contents or substance of a testamentary instrument may be thus established, though the instrument itself cannot be produced, upon satisfactory proof being given that the instrument was duly made by the testator, and was not revoked by him; but where allegations of this sort are made, they must be supported by the clearest and most stringent evidence.' "

This rule has been reiterated in Morris v. Swaney, 54 Tenn. 591, at page 599; Hunter v. Gardenhire, 81 Tenn. 658, at page 622; Asbury v. Hannum, 8 Tenn. Civ. App. 146, at pages 151, et seq. In this latter case it is said that the burden of proving "not only the contents of the will but its due and legal execution according to the forms of law and that it was not revoked by the testator in his life time rests upon the complainant . . ." who "must support this burden on the greatest and most stringent evidence." See, also, Annotation to 126 A. L. R., page 1139 at 1151, where it is said "where substantial evidence has been adduced to show the execution of a will, that it has been lost, that it was not revoked, and its contents, it is then permissible to prove in corroboration what the

testator said as to its contents." In 28 R. C. L. p. 386, it is said "Ordinarily the burden of proof is on the pro-pounders of a lost will to show it was in existence at the death of the alleged testator, or was destroyed in his life time without his consent or knowledge, in order to overcome the presumption or revocation."

The great weight of the evidence is that the will was destroyed by the testatrix with the intent of revoking it. Under the quoted authorities it cannot be set up and com-plainants' suit must fail.

■ The decree of the Chancellor in this respect must stand. But he went further and decreed that the will was destroyed with the purpose of reviving the Wrinkle Will. As we understand the record this question is not presented for determination. It is not presented by the pleadings even tho for the sake of argument the jurisdic-tion be conceded. To the contrary, if an assault is to be made upon the Wrinkle Will, this must be done when it is presented for probate. The decree of the Chancellor in this respect is erroneous.

■ The cost of the cause (below and on appeal) should be paid by the estate, or, which is the same thing, by taxing it to the beneficiaries in proportion to the in-terests they hold. The way the matter was handled made litigation inevitable and the estate should pay the cost. The executor not having qualified we think it best to tax the cost to the beneficiaries as aforesaid. The cause will be remanded to the Chancery Court for the execution of this decree. Modified and, as modified, affirmed.

McAmis and Burnett, JJ., concur.

McAmis, J. (concurring).

I concur in the result of the opinion of the Court upon the ground that Complainant failed to carry the burden

of overcoming the presumption that the will was destroyed animo revocandi. Even if defendant's evidence as to the circumstances surrounding the destruction of the will should be rejected, the fact remains that Mrs. Taylor had possession of the will and could have destroyed it at any time before her death and after her last declaration offered by Complainant as to her intended disposition of the estate was made. These declarations, therefore, do not carry the burden for Complainant if, indeed, they can be classified as "stringent" evidence as is required by cases cited in the opinion. It would be idle to grant the relief sought by the bill unless Complainant can produce evidence of this character when the will is propounded and contested in the Circuit Court. If she had made a prima facie showing by the character of the evidence required that the will was never revoked I think the will should be set up and all issues pertaining to testamentary intent and capacity remitted to the Circuit Court for trial.

In my opinion, for reasons set forth in Allman v. Freeman[1], Hamilton Equity, this day decided, the Chancery Court is without jurisdiction to decide such issues.

---

[1]Opinion not designated for publication.