
IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 15, 2017 Session

## IN RE ESTATE OF RUBY C. ROGGLI, ET AL.

**Appeal from the Chancery Court for Franklin County**
**No. 19998    Justin C. Angel, Judge**

_____

## No. M2016-02562-COA-R3-CV

_____

Decedent's nephews by marriage filed a petition seeking to recognize and establish a copy of a lost will as Decedent's last will and testament. The trial court determined that the will was still in existence at the time Decedent lost testamentary capacity, and that Decedent did not have exclusive access and control of her will. Appellants appeal the trial court's order establishing the lost will. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed and Remanded.**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which ARNOLD B. GOLDIN and BRANDON O. GIBSON, JJ., joined.

Jerre M. Hood, Winchester, Tennessee, for the appellants, Lanelle Clark Harrison, Janet Jullian, Charlotte Reynolds, and Colleen Sylvester.

Trudy McKelvey Edwards, Winchester, Tennessee, for the appellees, Estate of Ruby C. Roggli, Larry Shockley, Carl Spray, Charles Kent Clark, Jeff Clark, and Melissa Harrell.

## OPINION

### I.    Background

On February 27, 2007, Ruby C. Roggli ("Decedent") executed a last will and testament. The will provided for all personalty, excluding her jewelry and farm machinery, to pass to her sister, Lanelle Harrison, and to her nephew, Charles Kent Clark. The will further provided for her jewelry to pass to her nieces, Janet Julian and Charlotte Reynolds. The remainder of her estate, including her farm and farm machinery, were

devised to her nephews on her husband's side, Larry Shockley and Carl Spray (together "Appellees"). At the time of her death, Decedent was a widow with no children. Her heirs were her two surviving sisters, Lannelle Clark Harrison and Colleen Sylvester; two nephews, Charles Clark Kent and Jeff Clark; and three nieces, Melissa Harrell, Janet Julian, and Charlotte Reynolds. The Appellants in this case are Ms. Harrison, Ms. Sylvester, Ms. Julian, and Ms. Reynolds.

Mrs. Roggli and her husband inherited the farm from Mr. Roggli's parents. During his life, Mr. Roggli had a close relationship with Appellees. Prior to Mr. Roggli's death, Appellees assisted the Rogglis in working the farm and maintaining the property. After Mr. Roggli died in 2007, Mr. Shockley and his wife visited Mrs. Roggli every day until her death in 2015. Mrs. Roggli did not want a caretaker in her home and did not want to spend the night alone, so Appellees alternated nights so that she was never home alone at night. The Shockleys provided Mrs. Roggli lunch and dinner every day, assisted her in paying her bills and maintaining her property, and generally provided for all of her needs.

Mrs. Roggli had a large safe in her dining room where she kept all of her important papers including her will. The last time her will was physically seen was in approximately 2012, when Mrs. Roggli showed it to her sister, Ms. Harrison; after showing it to Ms. Harrison, Mrs. Roggli put the will back in the safe. At this time, Ms. Harrison noted that her sister's behavior was different. Specifically, Ms. Harrison stated that Decedent seemed like she just "wanted to die." Mrs. Roggli's physical and mental health continued to deteriorate after her sister's visit. In February 2015, after a series of falls, Mrs. Roggli moved into a nursing home. A petition to appoint a conservator was filed, and, in May 2015, without objection, Ms. Betty Shockley was appointed as Decedent's conservator. Mrs. Roggli died on July 15, 2015.

Decedent consistently and repeatedly expressed, to her friend and longtime legal advisor, Judge Thomas Faris, her desire that her real property pass to the Appellees and that her personalty pass to the Appellants. During her mental decline, and even after her death, several of Decedent's family members had access to her home and the safe where the will was kept. After an exhaustive search, the original will, which Decedent signed in 2007, was not located after she died.

On August 18, 2015, Appellees filed a petition to recognize and establish the lost will. Appellants filed an answer, and the matter proceeded to trial on October 3, 2016. Immediately prior to the hearing, the parties stipulated that the only issue was "whether said last will and testament dated February 27, 2007, has been revoked." The trial court determined that the will was still in existence at the time Decedent lost testamentary capacity and that Decedent did not have exclusive access and control of her will at the end of her life. On November 16, 2016, the trial court entered a final order establishing the 2007 will as a true and correct copy of the original, which could not be located after a

diligent search. Appellants appeal.

## II. Issues

Appellants raise three issues for review as stated in their brief:

1. Did the trial judge err in the application of the criteria necessary to establish a lost will, i.e., did the plaintiff prove by "the clearest and most stringent evidence that Testator did not have custody and control of the will after execution or that she had lost her testamentary capacity for a period before her death and the will was in existence at the time the loss of competency had occurred?"

2. Did the trial judge correctly apply the burden of proof standard to the proof necessary for plaintiff to prevail in establishing a lost will?

3. Did the trial judge improperly rule as to what the decedent wanted at the time of her death by considering the contents of the will in question, which is presumed to have been revoked, as evidence the decedent did not destroy the will in question?

## III. Analysis

As noted above, prior to trial, the parties stipulated that the sole issue was whether Decedent revoked her will. The long-standing presumption is that if a will is traced into the hands of the testator and not found after his or her death, the testator canceled it. *Hickey v. Beeler*, 171 S.W.2d 277, 279 (1942) (citing *Allen v. Jeter*, 74 Tenn. 672, 676 (1881). "The burden of rebutting this presumption is on the person seeking to establish a will." *Sanders v. McClanahan*, 442 S.W.2d 664, 668 (Tenn. Ct. App. 1969) (citing *Haven v. Wrinkle*, 195 S.W.2d 787, 794-95 (Tenn. Ct. App. 1945)); *Shrum v. Powell*, 604 S.W.2d 869, 872 (Tenn. Ct. App. 1980). To rebut the presumption that Decedent revoked her will, proponents of the will have the burden of proof, which we have previously described as follows:

When a will cannot be found after the death of the testator, there is a strong presumption that it was destroyed or revoked by the testator himself, and this presumption stands in the place of positive proof. One who seeks to establish a lost or destroyed will assumes the burden of overcoming this presumption by adequate proof. It is not sufficient to show that persons interested to establish intestacy had an opportunity to destroy the will. One must go further and show by facts and circumstances that the will actually

- 3 -

was lost or destroyed fraudulently or accidentally against, and not in accordance with, the wishes and intention of the testator.

The presumption that the will was destroyed by the testator, *animo revocandi*, may be rebutted, and its loss or destruction by other means may be shown, by circumstantial as well as positive evidence, [s]uch as: by showing that the testator did not have the custody and control of the instrument after its execution; that he had lost his testamentary capacity for a period before his death; that the will was in existence at the time the mental alienation occurred. The declarations of the testator, before or after making the will, are admissible in evidence to support or destroy the presumption of revocation.

**In re Estate of Leath**, 294 S.W.3d at 575 (citations omitted); *see also* **In re Estate of West**, 729 S.W. 2d 676, 678 (Tenn. Ct. App. 1987). Concerning the type of evidence necessary to meet the burden of proof, the **Leath** Court uses the term "adequate proof," but it does not define the term. Our case law has defined adequate proof as "clear, cogent and convincing." **In re Estate of Oakley**, No. M2014-00341-COA-R3-CV, 2015 WL 572747, at \*10 (Tenn. Ct. App. Feb. 10, 2015); **In re Estate of Leath**, 294 S.W.3d at 575. However, the proponent is not required to overcome the "almost impossible barrier" of proving absolutely, rather than circumstantially, that the will was not revoked. **Estate of Oakley**, 2015 WL 572747, at \*10. Because cases involving the validity of lost wills usually deal with deceased testators and interested parties, the evidence of the testator's intent or actions is most often circumstantial. It is logical, therefore, that courts addressing these cases require more proof than the usual preponderance of the evidence. Tenn. R. App. P. 13(d). "Doubtless this is due to the fear that a more elastic rule might bring about more fraud than it would prevent." **Id.** (citing **Sanders v. McClanahan**, 442 S.W. 2d 664, 667 (Tenn. Ct. App. 1969).

While it rests primarily with the trial court to determine whether the evidence is clear, cogent, and convincing, its finding is not conclusive. In reviewing such cases, it is the duty of the appellate court to determine, not whether the trier of facts could reasonably conclude that it is more probable that the fact to be proved exists than that it does not, but whether the trier of facts could reasonably conclude that it is highly probable that the fact exists. **Estate of Acuff**, 56 S.W.3d 527, 534 (Tenn. Ct. App. 2001) (citations omitted). Therefore, the party with the burden of persuasion may prevail only if he or she can "place in the ultimate factfinder an abiding conviction that the truth of [his] factual contentions are 'highly probable.'" **Colorado v. New Mexico**, 467 U.S. 310, 315 (1984). Accordingly, the determinative question under this standard of review is whether the Appellees have carried the burden to establish that it is "highly probable" that Decedent's 2007 will was not revoked by Decedent and should be established as a lost will.

The trial court found from the proof that Decedent "had a pattern of wanting to make sure her legal affairs were properly taken care of." Judge Thomas Faris was the Rogglis' friend and attorney for twenty-five years before he took the bench. In 1987, he drafted wills for Mr. and Mrs. Roggli. After Mr. Roggli died in 2007, Judge Faris went with Decedent to her attorney's office, so that she could update her will. Describing her as a very business-minded person, Judge Faris testified that Decedent was clear in her wishes. She wanted the real estate to go to Larry Shockley and Carl Spray and the personal property to go to Lanelle Harrison. According to Judge Faris, Decedent's wishes never wavered. The land, according to his testimony, was inherited from her husband's family, and by giving the land to her husband's nephews, Decedent was honoring her husband's wishes. Judge Faris testified that those were her wishes when the will was drawn in 2007 and that he was "sure that's what she still wanted 'til the day she died."

Judge Faris's testimony is bolstered by the testimony of Colleen Sylvester, Decedent's sister. Mrs. Sylvester stands to inherit part of the Roggli farm if the lost will is presumed to have been revoked. Despite this fact, Mrs. Sylvester stated, in interrogatories, that [Decedent] "would never have destroyed her will." Mrs. Sylvester affirmed this testimony at trial. Relying on the testimony of the witnesses, the trial court found that

> all the proof shows that [Decedent] was the type of person who would take care of her affairs and make sure everything was done properly. That being said, she does not strike the Court as someone who would attempt to revoke a will by destroying it. That seems to be out of her character.

Appellants argue that Decedent had exclusive access and control of her will because the will was located in the safe. The proof, however, does not support Appellants' claim. Mr. Shockley testified that the keys to the safe were in the drawer of a sewing machine located within six feet of the safe. Mr. Shockley also testified that the key to the safe had been in the same location since he was a child and that its location was common knowledge among family members. Although Ms. Harrison, Decedent's sister, testified that she did not know where the key to the safe was kept, she testified that she saw Decedent open the safe many times throughout the years. Considering all the times Ms. Harrison saw her sister open the safe, it is highly probable that she also saw her sister retrieve the key from the sewing machine located only a few feet from the safe.

Mr. Shockley also testified that Decedent's nephew, Kent Clark, and his wife Linda were given a key to Decedent's home at the time she went into the nursing home. Additionally, Mr. Shockley said that he saw Mr. Clark open the safe during the period of time that Decedent was in the nursing home. The Shockleys and Ms. Harrison testified that after Decedent's death, several members of her family had access to the house. The trial court determined that Decedent's custody and control of the executed will was

diminished by the number of people who had access to the executed will during the time she lacked testamentary capacity and moved into the nursing home. Ultimately, the trial court determined that Decedent did not have exclusive access and control of her will at the end of her life.

Appellants argue that the trial court erred in finding that Decedent lost testamentary capacity to revoke the will several years prior to her death and that the will was in existence at the time Decedent's mental decline occurred. Ms. Harrison testified that when she visited Decedent, approximately three years before her death, Decedent opened the safe, took out a document, and said, "this is the will." After she showed her the will, Decedent put the document back in the safe and locked it according to Ms. Harrison's testimony. This testimony supports the conclusion that the will was last seen in 2012. Although Ms. Harrison did not testify to her sister's lack of capacity, she did testify that Decedent's behavior was "different" around this time. According to Ms. Harrison, her sister "just wanted to die because her husband had died and she was crazy about him."

Betty Shockley, Mr. Shockley's wife, also testified. The Shockleys lived less than two miles from Decedent for twenty years preceding her death. As noted above, after Mr. Roggli died in 2007, the Shockleys played a large role in Decedent's care. According to Mrs. Shockley, Decedent gradually slowed down over the years such that, by 2013, Decedent could not take care of herself. According to Mrs. Shockley, after 2013, Decedent would forget to eat food that was prepared for her, so Mrs. Shockley had to sit with her to make sure she ate. Mrs. Shockley also assisted Decedent with bathing and household chores. Because Decedent could no longer take care of her business affairs, the Shockleys also assisted her in paying her bills.

Judge Faris also testified concerning Decedent's capacity in the last three years of her life. Specifically, Judge Faris testified that during the last three years, Decedent was not "in a condition that would have been appropriate to execute [or revoke] a will." "She had 92 really good years, and I think she passed at age 95." Judge Faris also testified that although he would expect Decedent to take care of her business and keep her important papers in the safe, "what happened from 2013 on is open to debate." The trial court relied on the testimony of Ms. Harrison, Mrs. Shockley and Judge Faris in determining that Decedent lost her testamentary capacity while in possession of the will. The trial court found that from the time the will was executed in 2007 until Ms. Harrison last visited her sister, Decedent still had possession of the will and had not destroyed or revoked it. The trial court determined that "the period of diminished capacity" was after Ms. Harrison's visit in 2012.

Appellants contend that Appellees did not meet their burden of proving, by "clear, cogent, and convincing evidence" that Decedent had not revoked her will. In support of this argument, Appellants cite *Kennon v. Gay*, (no case number in original), 1984 Lexis

2709, Tenn. Ct. App. (Feb. 28, 1984), in which this Court reversed the trial court's finding that a lost will had been established. The **Kennon** Court concluded:

> There is not proof or contention in this record that the deceased ever became mentally incapacitated so as to be unable to revoke the will. . . . There is also no showing that the deceased had no opportunity to revoke the will. Furthermore, there is no evidence tending to show that the will was actually lost or destroyed against and not in accord with the testatrix'[s] wishes and intention.

*Id* at *6. The instant case is not analogous to **Kennon**. Here, multiple witnesses testified that Decedent's capacity was diminished in the three years before her death. Decedent's sister even testified that her behavior had changed three years before her death and that she "just wanted to die." Although Appellants argue that there was "opportunity for the Decedent to revoke the will in the eight years between its execution and her death," the weight of the evidence does not support this contention. Appellant Lanelle Harrison testified that she saw Decedent's will in 2012, five years after it was executed. The evidence shows that Decedent's testamentary capacity was diminished the last three years of her life, i.e, 2012-2015.

Citing the fact that Decedent lived in her home until 2015 and that a conservator was not appointed until May 2015, Appellants argue that Decedent had capacity after the will was last seen to revoke same. However, the evidence clearly shows that despite the fact that Decedent lived in her home and had no conservator, she was not mentally able to take care of herself or her business affairs after 2012. Accordingly, the evidence supports the trial court's finding that between the last known sighting of the will and Decedent's death, Decedent did not have the capacity to revoke her will.

The weight, faith, and credit to be given witnesses' testimony lies in the first instance with the trial court. **Roberts v. Roberts**, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991). With regard to credibility determinations, this Court has stated:

> When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings. Further, "[o]n an issue which hinges on the credibility of witnesses, the trial court will not be reversed unless there is found in the record clear, concrete, and convincing evidence other than the oral testimony of witnesses which contradict the trial court's findings."

*In re M.L.P*., 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (citing **Seals v. England/Corsair Upholstery Mfg. Co., Inc.**, 984 S.W.2d 912, 915 (Tenn. 1999)); **In re Estate of Leath**, 294 S.W.3d 571, 574-75 (Tenn. Ct. App. 2008). Accordingly, where

issues of credibility and weight of testimony are involved, this Court will accord considerable deference to the trial court's factual findings. *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999)). Here, the trial court found the witnesses to be credible, and there is nothing in the record indicating otherwise.

The law presumes that a lost will has been revoked by the testator. However, in this case, the proof presented rebuts the presumption. It is undisputed that the Appellees took care of Mrs. Roggli for eight years after Mr. Roggli died. They prepared her meals and stayed every night in her home for eight years because she did not want to be alone. There is no evidence that during this eight year period, Mrs. Roggli had a dispute with Appellees or that their relationship had become strained causing her to revoke her will. Ms. Harrison testified that Mrs. Roggli was "crazy about [her husband]," and Judge Faris testified that she wanted to honor Mr. Roggli's wishes by keeping the Roggli family farm in the Roggli family. Judge Faris, who the trial court found credible, adamantly testified that Mrs. Roggli wanted the farm to go to the Appellees "'til the day she died." Notably, Appellant, Colleen Sylvester, testified that Mrs. Roggli "would never have destroyed her will." From the totality of the evidence, there is clear, cogent, and convincing proof to rebut the presumption that Decedent revoked her will. As noted earlier, the evidence also supports the trial court's finding that Decedent lacked testamentary capacity during the three year period between the last known sighting of the lost will and her death, thus negating Decedent's ability to have intentionally revoked her will.

## V. Conclusion

For the foregoing reasons, we affirm the order of the trial court. We remand the case for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed against Appellants, Lanelle Clark Harrison, Colleen Sylvester, Janet Jullian, and Charlotte Reynolds, and their surety, for all of which execution may issue if necessary.

_____
KENNY ARMSTRONG, JUDGE