IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
December 3, 2007 Session

IN RE ESTATE OF DAVID R. LEATH

Appeal from the Chancery Court for Knox County
No. P-06-651932    Daryl Fansler, Chancellor

No. E2007-00555-COA-R3-CV - FILED MARCH 3, 2008

Decedent's will could not be located after his death, and decedent's widow and stepdaughters petitioned the trial court to recognize and establish a copy of such will as decedent's last will and testament.  The trial court denied the petition upon determining that the petitioners failed to present sufficient evidence to overcome the strong presumption that the lost will was revoked by decedent. We affirm the judgment of the trial court and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Cause Remanded**

SHARON G. LEE, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

James A.H. Bell and William D. Hood, Knoxville, Tennessee, for the appellant, Raynella Dossett Leath.

Dale C. Allen and Luis C. Bustamante, Knoxville, Tennessee, for the appellants Raynella M. Dossett Connatser and Nancy K. Dossett.

James S. MacDonald, Knoxville, Tennessee, for the appellee Cynthia L. Wilkerson.

# OPINION

## I. Background

On March 13, 2003, David Leath was shot and killed in a bedroom of his home in Knox County by an undetermined assailant. After his death, a dispute arose between Mr. Leath's wife, Raynella Dossett Leath, and Mr. Leath's daughter from a prior marriage, Cynthia L. Wilkerson. Both women, in court filings, accused the other of murdering Mr. Leath. The portion of their dispute that is involved in this appeal concerns a will Mr. Leath made in 1996 which could not be found after his death. Additional interested parties are Raynella M. Dossett Connatser and Nancy K. Dossett, the children of Raynella Dossett Leath.

David Leath and Raynella Dossett Leath were married in 1993. On August 12, 1996, the Leaths went to the law office of their attorney, Charles Child, and executed separate wills. Mr. Child gave the parties the originals of the wills and retained signed duplicate copies at his office. According to Mrs. Leath, she placed the original of her will in a safe deposit box at the bank and Mr. Leath placed the original of his will in his sock drawer in a chest of drawers located in their bedroom. After Mr. Leath's death, his will could not be found.

On June 29, 2006, Mrs. Leath filed a verified petition in the Knox County Chancery Court attesting that the original of Mr. Leath's 1996 will was not located after a thorough and diligent search and requesting that the trial court recognize and establish as the decedent's last will and testament an attached copy of such will and appoint her to serve as personal representative of the estate. Mr. Leath's daughter, Cynthia L. Wilkerson, answered and counterclaimed, alleging, among other things, that Mrs. Leath killed the decedent and asserting that the fact that the August 12, 1996 will was missing was evidence that the decedent had revoked the will and died intestate. Attached to this answer was a separate complaint that Ms. Wilkerson had previously filed in the Knox County Circuit Court wherein she attested that Mrs. Leath had feloniously shot and killed the decedent, and had thereby forfeited any right to the decedent's estate and was precluded from serving as personal representative of the estate. Mrs. Leath filed her answer to Ms. Wilkerson's counterclaim, alleging that, on the contrary, Ms. Wilkerson had feloniously shot and killed the decedent and that she had thereby forfeited any right to his estate or to serve as the estate's personal representative. Finally, Mr. Leath's two stepdaughters, Raynella M. Dossett Connatser and Nancy K. Dossett, filed an answer and cross claim to Ms. Wilkerson's counterclaim and requested, inter alia, that their mother's petition be approved by the trial court.

The competing interests in the disposition of Mr. Leath's estate may be summarized as follows. The 1996 will named Mrs. Leath as executrix of the estate and provided that the decedent's mother, Mayme Leath, (who survived her son) receive a life estate in 16.27 acres of land located in Knox County. The will further provided that Mrs. Leath receive the residue of Mr. Leath's estate unless she died before Mr. Leath or the two died in a common accident, in which event all of Mr. Leath's property would go to Ms. Wilkerson, with the exception that any property that had come to him as a result of the death of Mrs. Leath would go to her two daughters, Raynella M. Dossett

Connatser and Nancy K. Dossett. Ms. Connatser and Ms. Dossett contend that, pursuant to this provision, if Mrs. Leath is precluded from participating in the distribution of Mr. Leath's estate, they are entitled to distribution of the estate as contingent beneficiaries. Upon a determination that the will was revoked, Mrs. Leath and Ms. Wilkerson would divide the estate equally in accord with state intestacy law. *See* Tenn. Code Ann. § 31-2-104.

The case came on for trial without a jury on August 17, 2006, and on December 15, 2006, the trial court entered its order and memorandum opinion denying Mrs. Leath's petition to establish the lost will upon its determination that Mrs. Leath had failed to present sufficient proof to overcome the strong presumption under applicable law that a will that cannot be located has been revoked by the testator. Mrs. Leath and her daughters, Ms. Connatser and Ms. Dossett, appeal this ruling.

### II. Issue

The sole issue we address in this case is whether the trial court erred in ruling that the appellants failed to submit sufficient proof to overcome the presumption that the decedent revoked his lost will.

### III. Analysis

#### A. Standard of Review

In a non-jury case such as this one, we review the record de novo with a presumption of correctness as to the trial court's determination of facts, and we must honor those findings unless the evidence preponderates to the contrary. Tenn. R. App. P. 13(d); ***Union Carbide v. Huddleston****,* 854 S.W.2d 87, 91 (Tenn. 1993). When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to either as to the trial court's factual findings. ***Seals v. England/Corsair Upholstery Mfg. Co., Inc.,*** 984 S.W.2d 912, 915 (Tenn. 1999). The trial court's conclusions of law are reviewed de novo and are accorded no presumption of correctness. ***Campbell v. Florida Steel Corp.,*** 919 S.W.2d 26, 35 (Tenn. 1996); ***Presley v. Bennett****,* 860 S.W.2d 857, 859 (Tenn. 1993).

#### B. Proof Required to Establish a Lost Will

A party seeking to establish a lost will must satisfactorily demonstrate 1) that the testator made and executed a valid will and that the testator is no longer living; 2) the substance and contents of the missing will; 3) that the will cannot be found after diligent search; and 4) that the will was not revoked by the decedent. ***Pritchard on Wills and Administration of Estates***, 5th Ed., § 51; ***Shrum v. Powell***, 604 S.W.2d 869, 871 (Tenn. Ct. App. 1982). In the case at bar, the only element in dispute is whether the decedent revoked his will.

A party seeking to establish a lost will has a heavy burden of proof. ***Pritchard on Wills and Administration of Estates***, ibid., describes this burden of proof as follows:

3

When a will cannot be found after the death of the testator, there is a strong presumption that it was destroyed or revoked by the testator himself, and this presumption stands in the place of positive proof. One who seeks to establish a lost or destroyed will assumes the burden of overcoming this presumption by adequate proof. It is not sufficient to show that persons interested to establish intestacy had an opportunity to destroy the will. One must go further and show by facts and circumstances that the will actually was lost or destroyed fraudulently or accidentally against, and not in accordance with, the wishes and intention of the testator.

The presumption that the will was destroyed by the testator, *animo revocandi*, may be rebutted, and its loss or destruction by other means may be shown, by circumstantial as well as positive evidence, [s]uch as: by showing that the testator did not have the custody and control of the instrument after its execution; that he had lost his testamentary capacity for a period before his death; that the will was in existence at the time the mental alienation occurred. The declarations of the testator, before or after making the will, are admissible in evidence to support or destroy the presumption of revocation.

In order to overcome the presumption of revocation, the proponent of a lost will is not required to overcome the "almost impossible barrier" of proving absolutely, rather than circumstantially, that the will was not revoked. *In re Estate of Brown*, No. 01A01-9809-PB-00471, 1999 WL 802718, at *11 (Tenn. Ct. App. M.S., filed Oct. 7, 1999). However, as we have heretofore indicated, the requirements for overcoming the presumption of revocation are, with good reason, quite exacting:

Where a will has been lost or destroyed, the person seeking to set it up labors under a severe handicap. Doubtless this is due to the fear that a more elastic rule might bring about more fraud than it would prevent.

*Sanders v. McClanahan*, 442 S.W.2d 664, 667 (Tenn. Ct. App. 1969) (citing *Haven v. Wrinkle*, 195 S.W.2d 787, 793 (Tenn. Ct. App. 1946)). As noted by this Court in *Shrum v. Powell*, 604 S.W.2d 869, 871 (Tenn. Ct. App. 1980), a person seeking to show that a lost will was not revoked by the testator must do so by presenting "the clearest and most stringent evidence" or "clear, cogent and convincing proof."

The appellants in the instant matter argue that the circumstances, as demonstrated by "the clearest and most stringent evidence" or "clear, cogent, and convincing proof," rebut the presumption that the decedent revoked or destroyed the lost will. Arguments advanced by the appellants include

4

that they proved that the decedent lacked the mental capacity required to revoke a will; that the decedent would not have revoked the will, as shown by his communications with third parties, the nature of his relationship with the appellants as compared to his relationship with Ms. Wilkerson, and the fact that he and Mrs. Leath had executed similar wills; that the decedent executed the subject will and previous wills and thereby indicated his desire to die testate; and that parties, other than the decedent, had access to the will and that inadequate consideration was given to the possibility that the will was either removed and/or lost by one of these other parties.

We have carefully reviewed the entire record in this case and have considered all of the appellants' arguments, and it is our determination that the trial court's ruling was correct and is well supported by the evidence and the applicable law. We conclude that the appellants did not overcome the presumption that the will was destroyed or revoked by the testator by clear, cogent, and convincing proof.

### 1. Capacity to Revoke

First, we address the argument that the decedent lacked the capacity to revoke the will.

As the trial court correctly noted in its memorandum opinion "no greater capacity is needed to revoke a will than is required to execute one in the first instance." *See* 79 AM. JUR. 2d *Wills* § 469 (2002). ("The same degree of mental capacity is necessary to revoke a will as to make one.") We have previously summarized the law regarding testamentary capacity as follows:

> The burden in a will contest is always on the one who alleges an unsound mind to prove it. *Harper v. Watkins*, 670 S.W.2d 611 (Tenn. Ct. App. 1983). That burden requires a contestant to produce evidence from which the jury could infer that the testator, *at the very time of executing the will*, did not know and understand the force and consequences of his act. *American Trust & Banking Co. v. Williams*, 32 Tenn. App. 592, 225 S.W.2d 79 ([Tenn.] 1948). A testator "is not rendered incapable of making a will by . . . old age, blunt perception, or failing mind or memory, if his mind is sufficiently sound to enable him to know and understand what he is doing." *Id.* 225 S.W.2d at 83. Evidence of a prior mental condition due to temporary, superficial, accidental, occasional or intermittent causes or conditions has little or no probative value - not enough to shift the burden of proving the testator's condition at the very time the will was executed. *Id.* 225 S.W.2d at 84.

*In re Estate of Oakley*, 936 S.W.2d 259, 260 (Tenn. Ct. App. 1996) (emphasis in original).

In support of their argument that the decedent did not know or understand the consequences of revoking his will and therefore, lacked the mental capacity to do so, the appellants rely primarily

upon the deposition testimony of Ronald Bryan, M.D., a neurologist who examined and treated the decedent within the three years preceding his death. Dr. Bryan attested that he first encountered the decedent in February of 2000, when he was hospitalized for "mental status changes, frank confusion, [and] diminished level of consciousness." According to Dr. Bryan, the decedent presented as "lethargic, sleepy but arousable" and "fundamentally coherent," but with loss of memory. An electroencephalogram (EEG) was conducted and produced an abnormal reading, and a magnetic resonance imaging (MRI) scan showed that the decedent had suffered a "mini stroke" as the result of the occlusion of a very small blood vessel in the brain. The decedent was next hospitalized in March of 2001, after he experienced an episode of confusion, and symptoms noted by Dr. Bryan included short term memory difficulties, such as forgetting to answer the phone or to take a bath; emotional ups and downs; short temper; and falling asleep frequently through the day. On March 1, 2002, Dr. Bryan conducted a mini-mental status exam which measured the decedent's orientation, memory, and attention, based upon responses to various questions. At one point during the test, the decedent began to cry because he was unable to spell a word backwards. Dr. Bryan testified that the decedent scored 22 out of a possible 30 on this test and that this score indicated "mild dementia" which in his opinion was demonstrated by a score ranging from 20 to 25. However, considering the possibility that the mini stroke that the decedent had suffered might be causing small seizures, Dr. Bryan prescribed an epilepsy medication. At a follow up exam on March 28, 2002, Dr. Bryan noted that the decedent's symptoms had improved in that he was no longer sleeping during the day, his memory was better, his mood was better and he was interested in more activities and had recently bought a fishing license. At a subsequent visit on July 3, 2002, Dr. Bryan re-administered the mini-mental status exam and the decedent achieved an improved score of 25. Dr. Bryan's testimony indicated that the decedent would have had a perfect score but for the fact that he could not spell a word backwards. Dr. Bryan prescribed a medication to improve the decedent's memory. At the next examination of the decedent on October 17, 2002, Dr. Bryan noted mood swings. When Dr. Bryan last saw the decedent on January 16, 2003, the decedent was "frustrated and tearful," and his mental status was "obviously deteriorating," as primarily exemplified by memory problems. Dr. Bryan attested that he believes that at this time the decedent was in a moderately advanced stage of Alzheimer's disease, and that at this stage a victim of such disease is likely to misplace things. Finally, Dr. Bryan testified that it was his opinion that the decedent would not have been able to understand the implications of destroying a will at the time of his last consultation.

We conclude that appellants failed to meet their burden of showing that the decedent could not have known or understood what he was doing with respect to the revocation of his will after his last visit to Dr. Bryan. We have noted Dr. Bryan's testimony regarding the improvement in the decedent's condition in late March and July of 2002, and in clinical notes made by Dr. Bryan during the last visit in January of 2003, he recorded that Mrs. Leath indicated that as of that time, the decedent's condition did not appear to be deteriorating and that many of his previous problems were no longer occurring.

We further note the below recounted testimony of multiple witnesses who had known the decedent for many years, interacted with him on successive occasions up until the time of his death, and observed nothing that would lead them to believe that the decedent was suffering from

diminished mental capacity. Roger Yarnell testified that he had been a close friend of the decedent since the decedent was a teenager, was an usher in the decedent's wedding, socialized with the decedent every week or two during the last three to four years of the decedent's life, and talked to the decedent the day before his death. Mr. Yarnell attested that he noticed no changes in the decedent's mental abilities and that the decedent always appeared to understand and know what he was doing and was normal the last time he talked to him. Mike Ogle, the owner of a local motor vehicle repair shop, testified that he had known the decedent since 1983, that he saw the decedent every month or so, and sometimes twice a week, during the last two years of the decedent's life, that at times the decedent would visit him for a couple of hours and that he was with the decedent two days before his death. Mr. Ogle testified that he never observed any confusion in the decedent and that the decedent always seemed to know and understand what he was doing. Peggy Rowe, the decedent's ex-wife, testified that she had occasion to see the decedent eight to ten times a year when he came to visit with her parents during the two to three years before he died and that she saw him at their house the week before he died. Ms. Rowe attested that she never observed any confusion in the decedent or that anything had happened to his mental faculties. Gordon Armstrong testified that he had known the decedent for forty five years, was the best man at the decedent's wedding, and considered the decedent to be his best friend. In Mr. Armstrong's words, the decedent "was on top of it," and he testified that the decedent never seemed confused or to have any problems with his memory and that the decedent usually arrived at their meetings ahead of time. We also note the testimony of attorney Charles Child regarding a February 4, 2003 meeting between himself and the decedent wherein they discussed the decedent's will. Mr. Child testified that although the decedent was emotional, the decedent knew what he was doing and why he was there and understood their conversation regarding the will. Finally, Mrs. Leath herself testified that after this meeting, the decedent understood instructions given him by Mr. Child as to what he should do if he wished to change the will.

In summary, we do not find that the evidence presented shows that the decedent was mentally incapable of revoking his will.

### *2. Communication of Intent to Third Parties*

The next question we must address is whether, given the decedent's adequate capacity to revoke the will, he would have done so. Citing *Third Nat'l Bank v. Stevens*, 755 S.W.2d 459,462 (Tenn. Ct. App. 1988), the appellants correctly note that the testator's intent is the guiding principle in all will cases. The appellants insist that the evidence shows that it was the decedent's intent that the will not be revoked and that he not die intestate. In this regard, we first address the appellants' argument that the decedent communicated this intent to others. As positive proof for this argument, the appellants rely upon the testimony attorney Charles Child, who stated that, at the February 4, 2003 meeting, the decedent gave him no instructions to change or revoke the subject will and that as the decedent was leaving the meeting the decedent said words to the effect of "this is my will and that is what I want." As legal authority for their argument, the appellants rely heavily upon *In re Estate of Brown*, 1999 WL 802718. In that case, the petitioner appealed the trial court's finding that she had failed to establish the lost will of her grand uncle by clear and convincing proof. In

reversing the judgment of the trial court, we noted, among other things, that the week before he died, the testator reiterated to one of his friends that he had a will and had left almost everything to the petitioner and another witness testified that the night before the testator suffered an incapacitating stroke, the testator stated that everything he had would go to his grand niece and showed the witness the box containing his will and instructions for his funeral arrangements. Given this testimony and other evidence, including evidence showing that another relative of the testator had access to the will and strong incentive to destroy it, we concluded that the petitioner overcame the presumption of revocation.

We find the *Brown* case and the instant matter are clearly distinguishable. In *Brown,* the proof showed that within twenty-four hours of his stroke, the testator reconfirmed his intent to leave everything to the petitioner, had his will in a box in its customary location, and expressly indicated his intention to leave it in that place. By contrast, in the instant matter, no positive evidence was introduced as to the decedent's testamentary intent after his last meeting with Mr. Child thirty-six days before his death. Given the extensive amount of intervening time and testimony by Dr. Bryan that the decedent was emotionally labile and as a result was more likely to change his mind than he would have been otherwise, we cannot agree that the appellants have overcome the presumption of revocation on this basis. We acknowledge Mr. Child's additional testimony that he always advised clients that if they intended to revoke their will that they let his office know so that a duplicate retained by the office would be destroyed and the further testimony of Mr. Armstrong that he believed that the decedent would have advised him (Mr. Armstrong) had he revoked the will. However, the assertion that the decedent would not have revoked the will without advising Mr. Child and Mr. Armstrong and that his failure to do so signifies that he did not revoke the will ignores the obvious possibility that the decedent would have advised them had he not been prevented from doing so by his sudden, unexpected death. We further note that whatever Mr. Child's instructions to Mr. Leath as to his office policy regarding revocation may have been, Mr. Leath was under no legal compulsion to contact Mr. Child in order to revoke his will. In any event, we do not agree that the decedent's failure to advise Mr. Child and Mr. Armstrong of the revocation constitutes the "clear, cogent and convincing proof" the appellants must present to meet their burden in this case.

### 3. Relationship With Others

The appellants also reference the testimony of Mrs. Leath and various other witnesses that the decedent had an excellent relationship with his wife and her two daughters. The appellants assert that this relationship was superior to the relationship the decedent had with his daughter and that based upon this fact, it is clear that the decedent would not have revoked his will in order to benefit his daughter at the expense of his wife and stepdaughters. Again, the appellants seek to rely upon *Brown*, ibid., in support of their argument and again, we find a clear distinction between *Brown* and this case. In *Brown*, the testator's brother was heir to his estate in the event of intestacy. However, evidence showed that the brother had no relationship with the testator until the testator became ill with lung cancer and that he visited the testator no more than two or three times in the preceding twenty years. By comparison, the record in *Brown* showed that the testator referred to the petitioner as his "daughter," that the testator and the petitioner enjoyed a loving and extremely close family

relationship, and that the testator's feelings for the petitioner remained unchanged the night before his incapacitating stroke.

By contrast, in the instant matter, while there was testimony indicating that the decedent had a generally good relationship with Mrs. Leath, Ms. Wilkerson testified that the decedent also had a good relationship with herself and her two children. Ms. Wilkerson also testified that she saw the decedent two to three times a week at the barbershop where she works and where the decedent was employed until his retirement. And she further testified that the decedent would spend time with her children on his farm and would ride bikes with them and let his grandson, Tyler, who was thirteen years of age when the decedent died, drive the farm tractor, and stay with the decedent when he was out of school for two to three days. And in contrast to the evidence in *Brown* that the relationship between the testator and the petitioner remained consistently good, in the instant case, Ms. Wilkerson attested to conflict between the decedent and Mrs. Leath during the days immediately preceding his death. In this regard, Ms. Wilkerson testified that Mrs. Leath called her on March 8, 2003, and told her that the decedent had gotten upset with her because she had failed to start the tractor correctly and that Mrs. Leath stated to her that "she was getting f'ing tired of this and would show him." Ms. Wilkerson further attested that Mrs. Leath called her again on March 11, 2003, and that the decedent "had acted angry and they had got into it or something." In light of the record as a whole, we do not agree that the evidence indicates such a disparity in the relationship between the appellants and Ms. Wilkerson as to necessitate the conclusion that the decedent would not have revoked his will to favor one party over another.

### 4. Third Party Access to Will

The appellants also argue that they submitted proof showing the will's location and its accessibility to third parties. In this regard, the appellants reference the testimony of both Mrs. Leath and Ms. Connatser that the will was last seen by them in 1996 in the decedent's sock drawer in the bedroom of the home where the decedent resided with Mrs. Leath. While there was some contradictory testimony from another witness indicating that at some point the will was kept in a kitchen cabinet, the appellants assert that, in any event, the evidence showed nothing other than that the will was kept somewhere in the marital home. The appellants note that Ms. Wilkerson testified that she had been to the decedent's home before and that nothing prevented her from visiting the home. Further, the appellant notes that other parties, including numerous law enforcement officers employed by the Knox County Sheriff's Department, were at the home after the decedent was killed. The appellants contend that given these circumstances, the trial court erred in failing to consider the possibility that the will might have been lost or destroyed by a third party. We disagree.

With respect to employees of the Sheriff's Department on the decedent's property after his death, Detective Perry Moyers, who served as lead investigator on behalf of the Sheriff's Department, testified that he discovered no will during the investigation and that logs generated at the time do not show that a will was ever located or removed from the house. The appellants present no proof to the contrary, and their assertion that the will may have been removed and lost by employees of the Sheriff's Department is based upon pure speculation and is not substantiated by

9

any positive proof. As to Ms. Wilkerson, although she did stand to benefit if the will could not be found, the appellants presented no proof that she knew where the will was located or that the will even existed. In fact, the only proof presented in that regard was Ms. Wilkerson's own undisputed testimony indicating that she had no discussions with the decedent regarding his will or what he wanted to do with his property and that she was unaware of the contents of the will until she was read Mr. Child's copy of the will on April 21, 2003, over a month after her father's death. Absent proof that Ms. Wilkerson knew of the will's existence and location or that she was even aware that destruction of the will would benefit her, we find no reasonable basis for the argument that Ms. Wilkerson destroyed the will. In sum, we find no basis for concluding that any party with access to the will other than the decedent either destroyed or lost the will, and we find no merit in the appellants' argument that the trial court erred by failing to consider that possibility in reaching its conclusions in this case.

### IV. Conclusion

After careful review of the record as a whole and upon consideration of all arguments raised by the appellants, including some not directly addressed herein, we do not agree that the evidence presented in this case supports the appellants' contention that the trial court erred in finding that they failed to establish the decedent's lost will by clear, cogent and convincing proof. Accordingly, the judgment of the trial court is affirmed and the case is remanded for further action consistent with this opinion. Costs of appeal are assessed to the appellants, Raynella Dossett Leath, Raynella Dossett Connatser, and Nancy K. Dossett.

_____

SHARON G. LEE, JUDGE

10