# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### November 19, 2014 Session

## IN RE ESTATE OF WILLIAM DANIEL OAKLEY

**Appeal from the Chancery Court for Cheatham County**
**No. P2307    George C. Sexton, Judge**

---

**No. M2014-00341-COA-R3-CV - Filed February 10, 2015**

---

This appeal arises from the denial of a petition to establish a lost will. Following a bench trial in which the opportunity and motive of key witnesses to destroy the original will were at issue, the trial court failed to "find the facts specially" as mandated by Rule 52.01 of the Tennessee Rules of Civil Procedure. The only findings of fact made by the trial court read: "The evidence in the case was relatively undisputed so this court will not reiterate a lot of the facts. The dispute between the parties is over how the evidence is to be interpreted." Whether or not the evidence was "relatively undisputed" is debatable; nevertheless, we have concluded that conflicting inferences can be drawn from undisputed evidence concerning the dispositive issue, that being whether persons who had access to the original will had the motivation to destroy the original will. Therefore, it was incumbent upon the trial court to make findings, even on stipulated or undisputed facts. *See Lovelace v. Copley*, 418 S.W.3d 1, 35 (Tenn. 2013). Because the trial court did not make sufficient findings of fact to afford this court a clear understanding of the basis of its decision, and realizing that the credibility of two key witnesses who may have had the opportunity and motive to destroy the original will was at issue at trial, we are unable to conduct an effective de novo review. Under these circumstances, we would generally remand a case such as this to afford the trial court the opportunity to state its findings of fact and conclusions of law and enter judgment accordingly; however, the judge who tried this case retired in August of 2014. Therefore, we have no choice but to vacate the judgment and remand for a new trial.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Vacated and Remand for New Trial**

FRANK G. CLEMENT, JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and W. NEAL MCBRAYER, JJ., joined.

David J. Callahan, III, Nashville, Tennessee, for the appellant, Alan Dale Oakley, Jr.

Christopher E. Thorsen, Nashville, Tennessee, for the appellee, Desiree Oakley.

## OPINION

William Daniel Oakley ("the decedent") committed suicide on May 22, 2013, at the age of 38. He is survived by his wife, two minor children, his parents, and a sister. The decedent's estate is valued at $2 million, and who inherits a principal asset of the decedent's estate, the Oakley Lumber Company, is dependent upon whether the decedent's last will and testament was revoked by the decedent. The dispositive provisions of the very short will state succinctly: "I leave my home, . . . to my wife, Desiree Oakley, and my two children, . . . I leave my business and property, Oakley Lumber Company, and all other business interests to my father, Alan D. Oakley." Thus, if the will is admitted to probate, the decedent's father inherits the decedent's business interests, which represents a substantial portion of the decedent's estate; however, if the lost will is not admitted to probate, the decedent died intestate and his wife and children are his heirs at law.

The proceedings which gave rise to this appeal were initiated on June 26, 2013, when the named executor of the will, who is not a beneficiary, filed a Petition to Open an Estate and Complaint, requesting that a copy of the testamentary document be established as the decedent's Last Will and Testament and admitted to probate; the decedent's father, Alan Oakley, joined in the petition. The decedent's wife, Desiree Oakley, opposed the petition. Following a bench trial, the court denied the petition, finding "the proof presented falls short of the clear and convincing standard." The relevant historical facts and procedural history leading up to the trial court's ruling are summarized below.

Oakley Lumber Company was founded in 1972 by the decedent's grandfather, who along with the decedent's father, Alan Oakley, managed the business until 1989 when Alan Oakley left to pursue a career in real estate. The decedent, who started working for the company at an early age, acquired the business from his grandfather in 1998, and the decedent operated the business until his death in 2013.

In 1999, Alan Oakley, started a new business, Oakley Window & Door, which he located on the same property as Oakley Lumber; the two companies, although separate businesses, shared the same warehouse, equipment, trucks, trailers, and other products.[1]

---

[1]The two companies maintained separate records and bank accounts, and it is undisputed that the decedent was the sole proprietor of Oakley Lumber, and that Alan Oakley was the sole proprietor of Oakley

(continued...)

Although the two businesses shared the same location and were separately owned, the decedent and his father worked cooperatively, made important business decisions together, and jointly marketed their businesses as "The Oakley Companies."

The decedent and his wife were married in 1996 and had two children together. Wife had a nursing degree but did not work during the marriage. The family home was located on eighty acres of property in Kingston Springs, a portion of which was principally used by the decedent's son to train for competitive motocross racing.

On September 19, 2012, the decedent executed a will that devised Oakley Lumber Company to his father, Alan Oakley; the rest and residue of the estate was bequeathed to his wife and children. Mary Frances Rudy, an attorney, was named the executrix. The subscribing witnesses to the execution of the will were Sean Hinton and Jeremy Sisemore, friends and colleagues of the decedent. Although the witnesses did not see the decedent place the will in the safe located in his office, the decedent subsequently told Mr. Sisemore that he had placed the will in his safe, where he also kept his parents' wills. According to the testimony of decedent's sister, Dorothy Oakley Turner, who was the bookkeeper for Oakley Lumber, the only people who had the combination to access the safe other than the decedent were herself and Jim Blye, the office manager of Oakley Lumber.[2]

Five months later, in February 2013, the decedent called Mr. Hinton and asked him to swing by the office.[3] When Mr. Hinton arrived, the decedent handed him an envelope labeled "Mary Francis Rudy"[4] and instructed him to deliver the envelope to her if anything should happen to the decedent. Mr. Hinton kept the unopened envelope in his home office and did not discuss the envelope with anyone until after the decedent died.

Mr. Sisemore dropped by the decedent's office in March 2013, and during the visit he asked the decedent if he had "taken care" of his will. The decedent replied that he had, at

[1](...continued)
Window & Door.

[2]Mr. Blye testified that another employee of Oakley Lumber, Kenny Melton, also had access to the safe; however, Mr. Melton did not testify, and he is not suspected of having any motive to destroy the will. Further, Mrs. Turner refuted that Mr. Melton had access to the safe before the decedent's death.

[3]Sean Hinton, a licensed general contractor, testified that he knew the decedent for twenty years and shared both a business relationship and close personal friendship with the decedent. Mr. Hinton also testified that he saw the decedent one to three times a week, primarily regarding business, in the eight months prior to his death.

[4]The envelope misspelled her middle name which is Frances, not Francis.

which time the decedent gestured to the safe in his office. The decedent also stated to Mr. Sisemore that his father's will and mother's will were kept in the safe.

Several family members and friends stated that the decedent appeared to be despondent, physically ill and losing weight for a period of time preceding his death. During this time, which was over several months, the decedent told several family members that he was sad and distressed over his family's spending habits; he also frequently commented on the stress of maintaining and operating his business as well as supporting his family.

Three weeks before his death, his father found the decedent alone and depressed at a cemetery near his home at which time he had a long, serious discussion with the decedent about his depression. The decedent told his father that he felt like a credit card to his family and did not have a healthy husband-wife relationship. At the end of their conversation, the decedent handed his father a wadded up piece of paper and told him to throw it away. Believing that the decedent had been cheered up, the decedent's father told the decedent that he would not throw it away, but would keep it and they could read it and laugh about it later. The decedent's father did not read the note until after the decedent's death; it reads as follows:

> My family, life has not been easy on me. I have been dealt a lot of things, and I've always tried to make the best of it all. I do not know why I can't make everyone happy. Lately, I only bring misery wherever I am. My wife and kids only see me down and out, and I can't figure out how to fix this. I have nothing more to give. I am too wore out, and I can't think right anymore. This is my choice, and it is only my fault. Nobody to blame except me.
>
> Dad, sell everything and get my family downsized so they learn to have a normal, simple life. Explain to them that I love them more than life. I wish I could have been stronger.

The decedent's depression and stress-related issues continued. On the day before his death, the decedent's father encouraged him to see a doctor about his depression, and the two of them went that day to visit a doctor. The doctor recommended exercise to reduce stress and prescribed a mild antidepressant for the decedent.

It was on the following day, May 22, 2013, that the decedent took his life. In the hours before his death, the decedent sent a text message to Jim Blye, the office manager of Oakley Lumber, that read:

-4-

At park by Walmart. Can't keep this together anymore. Make sure my family knows it was my problem, not them. I just had too much put on me through this life, and then got too weak to handle it. I'm sorry, bro. Please help sell it all and get them settled.

The police were immediately notified of the text and went to the scene to investigate. After finding the decedent dead, they searched his truck and among the items found was the decedent's briefcase. The police did not open the brief case. The decedent's wife was notified, and she came to the scene; she was allowed to take the briefcase with her when she left. The decedent's wife stated at trial that she does not remember taking his briefcase from the scene but several witnesses observed her leave with it.[5] Nevertheless, she acknowledged that the briefcase turned up in her room later, and she testified that it did not contain her husband's will.

The day after the decedent's death, Jim Blye, the office manager of Oakley Lumber, went to work as usual, despite encouragement from the decedent's father and sister to leave the business closed that day. Mr. Blye arrived at the office at 6:30 a.m., as he was typically responsible for opening the business every day. Although his usual practice was to open the safe when he arrived to, inter alia, remove the cash bag in order to transact cash sales, he testified that he could not recall whether he opened the safe when he arrived. At approximately 9 a.m., the decedent's father and sister arrived together, and they, along with Jim Blye, opened the safe in the decedent's office to look for a will or other important documents. The decedent's will was not found in the safe, but the wills for his parents were in the safe.

As instructed by the decedent months earlier, Mr. Hinton attempted to contact Mary Frances Rudy in order to deliver the envelope the decedent had given him. He was unable to reach her for a couple of weeks, however, because Ms. Rudy was out of town. Following her return, Mr. Hinton presented the envelope to Ms. Rudy at her office; she opened the envelope to find a copy of the decedent's will of which she was previously unaware.

Upon discovering that the decedent had executed a will, Ms. Rudy contacted the decedent's wife and father while Mr. Hinton remained in her office. Ms. Rudy conducted each phone call over speakerphone so Mr. Hinton could participate if needed. Ms. Rudy testified that the decedent's father was very surprised and upset upon learning that his son

---

[5]Those testifying that they saw the decedent's wife take the briefcase included Kevin Land, a friend of decedent's for fourteen years, and the decedent's mother, Dottie Howe.

had a will, but that the decedent's wife was relatively calm when she received the news. Ms. Rudy and Mr. Hinton both noted that the decedent's wife did not want the will read to her; instead, she wanted the document emailed to her attorney.

Ms. Rudy filed a Petition to Open an Estate and Complaint on June 26, 2013, pursuant to which she requested that the copy of the purported testamentary document be recognized and established as the decedent's Last Will and Testament and admitted to probate. The decedent's father later joined in the petition. The decedent's wife filed an answer denying the enforceability of the copy, arguing that even if the document had been properly executed, it had been revoked.

The case was tried without a jury on December 20 and 23, 2013, before the Honorable George C. Sexton.[6] Twelve witnesses testified, and as noted earlier, although much of the evidence is undisputed, conflicting inferences can be drawn concerning whether persons who had access to the original will had the motivation to destroy the will.

Attorney Mary Frances Rudy did not prepare the will, testifying that she was merely an acquaintance of the decedent and that she did not expect him to name her executrix. Nevertheless, as the named executrix, she felt obligated to petition the court to probate the copy as the decedent's last will and testament. Because the wife opposed the petition, contending the decedent had revoked the will, the court appointed Ms. Rudy administrator pendente lite pending a decision of the validity of the will. The court also granted Ms. Rudy the sole responsibility for managing Oakley Lumber in the interim.

Ms. Rudy testified that her biggest concern in supervising the lumberyard was protecting the company's assets from embezzlement. She also testified that her biggest obstacle in managing the company was combating the obstructive activities of Mr. Blye; she explained that he had been uncooperative and uncommunicative in discussing the business. Her initial concern regarding Mr. Blye arose when the decedent's father stated that he did not trust Mr. Blye, which raised Ms. Rudy's concerns about protecting the assets of the company from embezzlement. An example of her difficult dealings with Mr. Blye occurred when the decedent's father informed her that Mr. Blye had deleted files from the decedent's office computer. Upon hearing this, she questioned Mr. Blye, at which time he became very hostile and refused to let her look at any of the company's computers. As Ms. Rudy's concerns regarding Mr. Blye escalated, she asked Mr. Blye to give her his iPhone, which was owned by Oakley Lumber. Although Mr. Blye gave her the phone, Ms. Rudy testified that he refused to give her the four-digit security code for the phone. Feeling compelled to investigate the

---

[6]The Honorable George C. Sexton, Judge of the Circuit Court for the 23rd Judicial District who tried this case, did not seek re-election and his term expired on August 30, 2014.

matter and realizing the court had ordered her to manage the business, Ms. Rudy hired a computer forensic investigator, Steven Jackson, to examine computer records, security footage, and other matters he deemed relevant; Mr. Jackson was authorized to download all the information from the decedent's computer and from Mr. Blye's computer.

Mr. Jackson testified that he copied the hard drives of Mr. Blye's computer and the decedent's computer. He discovered that a video camera system had been installed on Mr. Blye's computer for cameras positioned on the outside of Oakley Lumber, but he did not know the date of installation. He also testified that Mr. Blye's computer was set up to be the server for stored video footage, and that one would have to get into Mr. Blye's computer to view or delete video footage. Mr. Jackson testified that he discovered some of the video footage had been selectively deleted; specifically, video footage of May 2, July 3, July 21, July 24, and July 26, 2013, had been deleted, but the video footage for all other days was still on Mr. Blye's computer. Furthermore, Mr. Jackson testified that 12,124 files had been deleted from the hard drive of Mr. Blye's computer, with the majority of the deletions occurring prior to the decedent's death.

The information on Mr. Blye's computer also included phone records and text messages from Mr. Blye's company iPhone because his phone and computer were synced. Mr. Jackson testified that Mr. Blye last updated his iPhone to the office computer on March 7, 2013. Mr. Jackson further testified that he found iPhone text messages on Mr. Blye's computer, and that the most recent text message was from April 4, 2013; however, he stated that he was not able to search Mr. Blye's iPhone because Mr. Blye refused to reveal the four-digit code. In November 2013, five months after Ms. Rudy's initial request, Mr. Blye was subpoenaed and relinquished the four-digit code to the company iPhone entrusted to him.

Dorothy Oakley Turner, the decedent's sister, had served as the bookkeeper for Oakley Lumber for the past six years. She testified that her father's separate business was located in a building on the same property as Oakley Lumber, and that both businesses worked together with overlapping duties between employees, but each company maintained its own books, bank accounts and profits. She testified that the decedent treated Oakley Lumber as a family business, that he shared a close relationship with their father, and that the decedent and their father made major decisions about Oakley Lumber together.

Mrs. Turner stated that she saw the decedent every day at work for six years, and that beginning in January 2013, she noticed changes in the decedent's physical appearance, including weight loss, a sickly complexion, and an apparent lack of sleep. She testified that the decedent had begun sleeping in his office three to four times a month. A week before his death, he told her that he was so tired of working all the time, and that he wanted things to be simpler so he would not have to work so much. He also told her that he was not happy

with his home life or marriage, and he pointed out that she (his sister) had chosen well in her marriage and that he had not.

Mrs. Turner testified that Oakley Lumber's business hours were Monday through Friday from 7 a.m. to 4:30 p.m., and that she worked every day, arriving around 9 a.m. She explained that Mr. Blye, as the manager of the business, usually opened the business around 6:30 a.m., at which time he would open the safe in the decedent's office to retrieve the checkbook and cash bag, which he would place on her desk. On those occasions when neither the decedent nor Mr. Blye arrived before her, Mrs. Turner, as bookkeeper, was responsible for opening the safe in order to remove the cash bag. At the end of the day, Mrs. Turner placed the checkbook and cash bag back in the safe. Mrs. Turner testified that she never went through the safe because it wasn't her business, but that she knew her mother's and father's wills were in the safe. She testified that the only people who had the combination to the safe were herself, the decedent, and Mr. Blye.

On the day of the decedent's death, she and Mr. Blye left during normal business hours at which time Mr. Blye insisted upon opening the business the day after the decedent's death. When she arrived at work around 9 a.m., Mr. Blye was already there with his wife, as well as a few other employees. At that time, she, Mr. Blye, and the decedent's father opened the safe in the decedent's office, and they did not find the decedent's will. She also stated that, after the decedent passed away, Mr. Blye was trying to take on the decedent's responsibilities in the company and started parking in the decedent's spot.

The decedent's aunt, Jennifer Oakley, testified about an incident that she noticed at a family gathering on Easter 2013. She stated that she was rubbing the decedent's shoulder after an injury, at which time she suggested to his wife that she should rub it later that evening, to which the wife replied, "I'm not rubbing his f'ing back."

Ms. Jennifer Oakley also recalled receiving a telephone call from the decedent's wife at 7 a.m. on the morning after the decedent's death. She testified that decedent's wife, Desiree Oakley, denied any marital trouble. In a separate conversation a few days after the decedent's death, the decedent's wife told her that "the lumberyard is gone, I don't want it, my son doesn't want it," and that the decedent's wife had obtained counsel at that point that "had nothing to do with the Oakleys."

She also testified that, two days after the decedent's death, she saw Mr. Blye at the office sobbing hysterically, and that Mr. Blye told her he felt like he was in the middle between the decedent's wife and the decedent's father. She testified that Mr. Blye said that he had talked to the decedent's father and that he didn't know what to do, because he was "stuck in between them."

The decedent's father, Alan Oakley, testified that he helped his father open Oakley Lumber in 1972 and that he worked in his father's business until 1989 when he left to go into real estate. Ten years later, he opened Oakley Window & Door, which he located next door to Oakley Lumber so that both companies could use the same warehouse and share equipment and employees when necessary. Although the two businesses are separate business entities, Alan Oakley testified that they are marketed as "The Oakley Companies," a phrase coined by his son, the decedent, to display on their websites and plastic wrap placed on the products they sold. He further testified that he has the keys and security code to Oakley Lumber, but that he did not have access to the safe in the decedent's office.

Four days after the decedent's death, at which time it was believed the decedent did not have a will, Alan Oakley called Mr. Blye to check on him, and Mr. Blye said he was "torn" between his loyalty to the decedent's wife and to him, Alan Oakley. He further testified that Mr. Blye clarified this statement by saying that he wanted to be the boss and for the men to work for him. Mr. Oakley further testified that, on the day following this conversation, the decedent's wife went to the lumberyard and told the men she was going to close it. Mr. Oakley spoke with her later that day and talked her out of closing the business.

Dottie Howe, the mother of the decedent, testified that, in the months before the decedent's death, she noticed her son had dark circles under his eyes, was not sleeping or eating well, and that he had lost weight. She stated that he told her that he was very tired and sad, and that he expressed concern about the stress and pressure to support his family. He specifically stated that he wanted his family to spend less money and be more humble, and for things to be simpler.

She further testified that she observed an argument between the decedent and his wife at her house on Easter 2013. Specifically, she testified that the decedent's shoulder was hurting, and, upon another family member's suggestion that his wife rub it later that evening, the decedent's wife said, "I'm not rubbing his back." In addition, Ms. Howe testified that she always had a close relationship with her grandchildren, but that, since the decedent's death, she does not see her grandchildren as often because she cannot get in touch with them.

Jeremy Sisemore, one of the attesting witnesses, testified that he received a telephone call from the decedent's wife a few weeks after the decedent's death in which she asked if he had signed the decedent's will; he responded that he had. Later on, she called him again

asking if he would sign paperwork stating that he did not sign or witness the will; Mr. Sisemore informed her that he would not sign anything of that nature, and the decedent's wife did not contact him again.[7]

The decedent's wife, Desiree Oakley, testified that she had no knowledge that her husband was depressed or that he had created a will. Despite knowing that he went to the doctor the day before his death and that he was prescribed an antidepressant, she did not notice any signs of depression. She further testified that he never talked about his sadness or his dissatisfaction with his home life with her, or the conversations regarding his emotional state with his family members. She acknowledged that he was always stressed about money and work; however, she insisted that they had a good, strong relationship without any marital problems. She also denied saying that she wouldn't rub her husband's shoulder on Easter 2013 or that she was having an argument with him that day.

During cross-examination, she was questioned about a conversation she had with her husband when he asked her to cut back on expenses, and she replied that he would ask her to slow down on spending around April 15th of every year because of taxes. Counsel then clarified the question by referencing a conversation that took place after taxes were due, either in late April or early May. She then began detailing the event, testifying that her husband did not ask her to cut back, but rather, asked that the family to slow down on their son's motocross racing every weekend. Then, while being examined by her attorney regarding the same conversation, she testified that the decedent told her things were tough, and she replied that she was more than capable of going back to work to help out, but the decedent refused. She further testified that she said, "if the lumberyard is killing you, it has to go." When pressed by counsel for the estate about why she had suddenly remembered these details, she stated that, "[The decedent] and I never had a conversation about downsizing anything. Cutting back on spending money, yes," and, "I would have never thought that our talks . . . would have been under such scrutiny for me to remember what is - what everybody wants to say everything was except for what [the decedent] and I knew that it was."

During discovery, it was discovered that text messages and phone calls had been deleted from her phone for the period from March 21, 2013, to September 19, 2013, (two

---

[7]On cross-examination, Mr. Sisemore admitted that he did not, in fact, see the decedent sign the will, but instead, that the decedent had already signed the will before handing it to he and Mr. Hinton to sign as witnesses. The foregoing notwithstanding, the parties have stipulated that the September 19, 2012 will was validly executed in compliance with Tenn. Code Ann. § 32-1-104. It is undisputed that the testator (the decedent) informed the two attesting witnesses, Mr. Sisemore and Mr. Hinton, that the instrument was his will, and that he had signed the will. At the decedent's request, the two attesting witnesses signed in his presence and in the presence of each other.

months prior to and four months after her husband's death) but that information before and after those dates remained on her phone. When questioned about this, she testified that she did not recall how this occurred. She stated that her husband did not phone or text her on the day of his death.

Five days after her husband's death, the decedent's wife called Mr. Blye and left him a voicemail. Although this outgoing call was one of those deleted from her phone, her voicemail was retrieved from Mr. Blye's iPhone, after he was subpoenaed to reveal his four-digit code during discovery. The voicemail reveals that the decedent's wife told Mr. Blye that she was coming to the office the next morning to talk with him about whatever he needed to talk about; she also stated that she was going to "put her game face on" and that "we can do it." After hearing the voicemail at trial, she testified that she was just checking up on Mr. Blye because she wanted him in a positive mood to run the lumberyard so that her son could one day start working at the office.

In the days following the decedent's death, she testified that her father-in-law called her around 7 a.m. saying he was going to the office to check on everyone because there needed to be a "chief." She disagreed, arguing that Mr. Blye should run the business, as he did when she and her husband were on vacation, to which he responded saying, "I'm out." She also testified that she did not have an agreement with Mr. Blye that he would be in charge of the company; she also stated that Mr. Blye was simply a business acquaintance.

Jim Blye, the manager of Oakley Lumber, testified that he left his prior job in California because he did not get along with his boss and the company accused him of "inventory missing." He further testified that he informed the decedent that he had been accused of theft in his previous job prior to being employed at Oakley Lumber. Mr. Blye testified that he generally arrived at work by 6:30 a.m. and would usually open the business unless the decedent arrived early. When he opened the business it was his daily routine to open the safe in the decedent's office to take the cash bag, checkbook, and pink tickets out of the safe and place them on Mrs. Turner's desk, who served as the bookkeeper. On the day of the decedent's death, he testified that he opened the office as usual. The day after the decedent's death, Mr. Blye arrived at the office with his wife at 6:30 a.m., but does not remember if he opened the safe by himself when he first arrived, which was his normal routine. He testified that he remembered opening the safe later that morning with the decedent's sister and father, but the decedent's will was not in the safe.

Mr. Blye testified that the decedent was his boss and that they were good friends, but the decedent seldom mentioned his personal life and never mentioned a will. In the months preceding his death, the decedent told Mr. Blye that his family was spending a lot of money

on racing and that he was going to have to cut back, but the decedent never mentioned any marital problems or that his family's spending was out of control.

Mr. Blye stated that his computer was the server for the video surveillance system and that all video footage fed into his computer only. When asked about the deleted video footage, he testified that the IT guy set up the computer to save four days worth of video, and the computer would delete the oldest footage. When asked why video footage was deleted in the middle of a time period, he testified that he did not know. When asked why he did not reveal the four-digit code to his iPhone, he testified that he told Ms. Rudy that the code was at the house, and that he needed to call his wife to look for it, but his wife was not at home. When questioned how he could have consistently used his phone prior to Ms. Rudy taking it without recalling the password, he responded evasively, "[The iPhone] can be set up to at five minutes that they lock or five hours they lock. I don't recall what it was set up for."

Mr. Blye did not recall having a conversation regarding the continuation of the business with the decedent's father or the decedent's wife. He stated that he did not recall discussing with either of them his ability to run the business, his desire to do so, or being "torn" between them.

At the conclusion of the bench trial, the trial court ruled that the proof was insufficient to establish a lost will. The trial court's two-page Memorandum Opinion and Order on January 15, 2014, states, in relevant part:

> The evidence in the case was relatively undisputed so this court will not reiterate a lot of the facts. The dispute between the parties is over how the evidence is to be interpreted. Obviously, the petitioners to establish the will interpret the evidence as establishing a copy introduced at trial as the deceased's last will and testament, and the widow interprets the evidence as not establishing the copy as the last will and testament.
>
> The parties stipulated 1) that the deceased made and executed a valid will and that the testator is no longer living; 2) the substance and contents of the missing will; 3) that the will cannot be found after diligent search. Therefore, the only issue before the court is whether the will was revoked by the decedent. (Even though there was some argument during the trial about the deceased's testamentary capacity to revoke the will, this court finds no evidence decedent lacked testamentary capacity to make or revoke a will at the time of his death.)

In reaching a decision this court must consider the following well established principals of Tennessee law:

> 1. When a will cannot be found after the death of the testator, there is a strong presumption that it was destroyed or revoked by the testator himself, and this presumption stands in the place of positive proof; and

> 2. The presumption is rebuttable, but requires proof that is the clearest and most stringent evidence or clear, cogent and convincing to rebut the presumption the decedent revoked or destroyed the lost will. *In re Estate of David R. Leath*, 294 S.W.3d 571, 576 (Tenn. Ct. App. 1980 [sic]).

This was a well tried lawsuit, but like a well played ballgame somebody must lose. Even though in some sports there can be a tie, there can be no tie in a lawsuit. If there is a tie in a lawsuit, the party having the burden of proof loses. Since the arguments propounded by the petitioners to establish the will were rejected by the court in *Leath* based on evidence more convincing than the proof in this case, this court is compelled to find the proof presented falls short of the clear and convincing standard. Therefore, the petitions to prove a lost will must be dismissed.

Based upon the foregoing, the trial court dismissed the petition to establish a lost will and ordered that Letters of Administration be issued to the decedent's wife to administer the intestate estate.

The decedent's father, Alan Oakley, appeals, contending, inter alia, that the trial court committed reversible error in failing to submit written findings of fact as required by Tennessee Rule of Civil Procedure 52.01, and that he presented evidence sufficient to rebut the presumption that the decedent revoked his will.[8]

**ANALYSIS**

The father of the decedent contends that his son did not revoke his will; instead, he insists he presented sufficient evidence to establish that the will was destroyed by the

---

[8]The father also contends the evidence presented at trial concerning the decedent's lack of testamentary capacity rebutted the presumption of revocation as to his Last Will and Testament. We have determined that this issue is rendered moot by our decision; therefore, it is not discussed.

decedent's wife and/or Mr. Blye, the office manager, both of whom he contends had the opportunity and motive to destroy the original will. We shall, therefore, first consider the legal requirements to establish a lost will. We shall then consider whether the trial court's modest findings of fact comply with Rule 52.01 of the Tennessee Rules of Civil Procedure, and, if not, whether the record is sufficient for this court to rule on the evidentiary issues or whether we must remand for further proceedings.

## I. PROOF REQUIRED TO ESTABLISH A LOST WILL

In order to establish a lost will, a party must satisfactorily demonstrate: 1) that the testator made and executed a valid will and that the testator is no longer living; 2) the substance and contents of the missing will; 3) that the will cannot be found after diligent search; and 4) that the will was not revoked by the decedent. *In re Estate of Leath*, 294 S.W.3d 571, 575 (Tenn. Ct. App. 2008) (citing *Pritchard on Wills and Administration of Estates*, 5th Ed., § 51; *Shrum v. Powell*, 604 S.W.2d 869, 871 (Tenn. Ct. App. 1980)).

There is a strong presumption that a lost will was destroyed or revoked by the testator. *Leath*, 294 S.W.3d at 575 (citing *Pritchard on Wills and Administration of Estates*, 5th Ed., § 51). However, *this presumption may be rebutted by circumstantial* as well as direct evidence, and the declarations of the testator, before or after making the will, are admissible in evidence to support or destroy the presumption of revocation. *Id*. In order to overcome the presumption of revocation, the proponent of a lost will must present "clear, cogent and convincing proof" that rebuts the presumption. *Id*. at 575-76 (quoting *Shrum*, 604 S.W.2d at 871). However, the proponent of a lost will is not required to overcome the "almost impossible barrier" of proving absolutely, rather than circumstantially, that the will was not revoked. *Id*. at 575 (quoting *In re Estate of Brown*, No. 01A01-9809-PB-00471, 1999 WL 802718, at *11 (Tenn. Ct. App. Oct. 7, 1999)).

## II. RULE 52.01 OF THE TENNESSEE RULES OF CIVIL PROCEDURE

We shall now consider whether the trial court made findings of fact as required by Rule 52.01 of the Tennessee Rules of Civil Procedure to determine whether the decedent revoked his will prior to his death.

Rule 52.01, as amended effective July 1, 2009, provides as follows:

In all actions tried upon the facts without a jury, *the court shall find the facts specially and shall state separately its conclusions of law* and direct the entry of the appropriate judgment. . . . If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear

therein. Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rules 41.02 and 65.04(6).

(Emphasis added).[9]

Rule 52.01 clearly mandates that the trial court shall find the facts and shall state separately its conclusions of law in all actions tried upon the facts without a jury. *Lovelace v. Copley*, 418 S.W.3d 1, 34 (Tenn. 2013). The underlying rationale for this mandate is that it facilitates appellate review by "affording a reviewing court a clear understanding of the basis of a trial court's decision." *Id*. (internal citations omitted). In the absence of written findings of fact and conclusions of law, "this court is left to wonder on what basis the court reached its ultimate decision." *In re Christian G.*, No. W2013-02269-COA-R3JV, 2014 WL 3896003, at *2 (Tenn. Ct. App. Aug. 11, 2014) (quoting *In re K.H.*, No. 2008-01144-COA-R3-PT, 2009 WL 1362314, at *8 (Tenn. Ct. App. May 15, 2009)).

In this case, the trial court did not make "specific findings" of fact. The only "findings" made by the court were that "[t]he evidence in the case was relatively undisputed so this court will not reiterate a lot of the facts," and "[t]he dispute between the parties is over how the evidence is to be interpreted." The remainder of the trial court's two page ruling focused on its conclusions of law. Specifically, the trial court concluded that, "[s]ince the arguments propounded by the petitioners to establish the will were rejected by the court in *Leath* based on evidence more convincing than the proof in this case, this court is compelled to find the proof presented falls short of the clear and convincing standard."

While there is no bright-line test by which to assess the sufficiency of the trial court's factual findings, the general rule is that "the findings of fact must include as much of the subsidiary facts as is necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue." *Lovelace*, 418 S.W.3d at 35 (quoting 9C *Federal Practice and Procedure* § 2579, at 328). Of particular significance to the trial court's singular finding that the evidence was "relatively undisputed" is the principle that courts need not make findings on stipulated or undisputed facts, "*unless conflicting inferences can be drawn from undisputed facts*." *Id*. (emphasis added).

---

[9]For a discussion of the trial court's responsibilities when ruling upon a motion for summary judgment pursuant to Rule 56 as distinguished from its duties under Rule 52.01 following a bench trial, *see Bridgeforth v. Jones*, No. M2013-01500-COA-R3-CV, 2015 WL 336376, at *6 (Tenn. Ct. App. Jan. 26, 2015).

We have concluded that conflicting inferences may be drawn from material facts that are relatively undisputed; therefore, it was incumbent upon the trial court to provide a clear understanding of the basis of its decision, but the trial court failed to do so. *Id*. These conflicting inferences arise from challenges to the credibility of two key witnesses, namely, the decedent's wife and Mr. Blye. This is due to the undisputed fact that Mr. Blye had access to the decedent's safe on the day of his death and at 6:30 a.m. the following morning when he opened the business, realizing that it was customary for Mr. Blye to open the safe each morning to retrieve the cash bag and other items necessary to facilitate business operations. Additionally, it is undisputed that the decedent's briefcase was found by the police when they came to the scene, that the police did not open the briefcase, and the decedent's wife was permitted to take it with her.

Mr. Blye and the decedent's wife both deny ever seeing the decedent's will; however, their credibility was put at issue. Two witnesses stated that Mr. Blye desired to be in charge of the business, and that he and the decedent's father conflicted over this issue. Moreover, Ms. Rudy testified that she believed that the decedent's wife wanted Mr. Blye to run the company, and not the decedent's father. Thus, if there were no will, the future of the company would be controlled by the decedent's wife, not his father. Nevertheless, for reasons not explained by Mr. Blye, he felt "torn" in his loyalty to the decedent's wife and the decedent's father, which raises suspicion because in the absence of the will the decedent's father would inherit nothing. Thus, if Mr. Blye had no knowledge of a will, there would be no reason to believe that the decedent's father would have any control over the business.

As for the motive of the decedent's wife, if the will was admitted to probate, she would not inherit the business or any of its attendant assets; if there were no will, she and her children would inherit the entire estate.

Moreover, the credibility of Mr. Blye and the decedent's wife is at issue due in part to several suspicious circumstances including the deletion of text messages from the phone of the decedent's wife for a period of months immediately prior to and following the decedent's death, but no other messages had been deleted from her phone, and Mr. Blye's refusal to provide the four-digit code to his company iPhone until he was subpoenaed five months after Ms. Rudy's initial request. In addition, surveillance footage located only on Mr. Blye's computer was selectively deleted on specific days.

It has long been recognized that the trial court is in the best position to determine whether a witness's testimony is credible, *see Tenn-Tex Properties v. Brownell-Electro, Inc.*, 778 S.W.2d 423, 425-26 (Tenn. 1989); however, the failure of the trial court to make findings of fact concerning the material facts at issue deprives this court of having "a clear understanding of the basis of a trial court's decision," which is the rationale for the

-16-

requirement that the trial court make specific findings of fact. *Lovelace*, 418 S.W.3d at 34. This rationale remains even if the evidence is "relatively undisputed," if and when conflicting inferences can be drawn from the undisputed facts. *Id*. at 35.

As our courts have repeatedly acknowledged, when a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to either *as to the trial court's factual findings*. *See Seals v. England/Corsair Upholstery Mfg. Co., Inc.*, 984 S.W.2d 912, 915 (Tenn. 1999). However, that deference disappears when the trial court fails to make specific factual findings as to the material facts.

When the trial court fails to make the requisite findings of fact, we can conduct a de novo review of the record to determine where the preponderance of the evidence lies or, in the alternative, remand the case to the trial court with instructions to make the requisite findings of fact and conclusions of law and enter judgment accordingly. *See Lovlace*, 418 S.W.3d at 36 (internal citations omitted). However, our ability to read the transcript of the evidence cannot replace the discerning value of seeing or hearing the testimony of witnesses whose credibility is at issue, especially in a case as here, where the witnesses may or may not have had the motive or the opportunity to destroy a will. Accordingly, as for the first and more expedient option, we have concluded that a de novo review by this court, pursuant to which we would make our own findings concerning the material facts, is not appropriate due to the conflicting inferences that can be drawn from the "the undisputed facts" pertaining to the dispositive issue of whether someone other than the decedent, who had the opportunity and motive, destroyed the original will. The second option, remand to the trial court with instructions to make the requisite findings of fact and conclusions of law and enter judgment accordingly, is also not available because the judge who tried this case retired in August 2014.

However, Tennessee Rule of Appellate Procedure 36 provides this court with an additional remedy. Rule 36(a) authorizes appellate courts to grant "the relief on the law and facts to which the party is entitled or the proceeding otherwise requires." Tenn. R. App. P. 36(a). Based on the above legal principles and the realization that conflicting inferences can be drawn from the undisputed material facts pertaining to the dispositive issue, we have concluded that the trial court's failure to comply with Rule 52.01 of the Tennessee Rules of Civil Procedure requires this court to vacate the judgment and remand for a new trial on the

petition to establish a copy of the September 19, 2012 testamentary document as the decedent's Last Will and Testament.[10] *See* Tenn. R. Civ. P. 36(a); *see also Lovelace*, 418 S.W.3d at 37.

## IN CONCLUSION

The judgment of the trial court is vacated, and this matter is remanded for a new trial. Costs of appeal assessed equally against the appellant and the appellee.

_____
FRANK G. CLEMENT, JR., JUDGE

---

[10]We regret that this determination will prolong litigation; however, we believe remand is the only available option based upon the unique facts and circumstances of this particular case.